**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**FIFTH AVENUE COACH LINES, INC.,**
Victor Muscat, Edward Krock, Thomas
A. Bolan, Roy M. Cohn, Defendants.

No. 67 Civ. 4182.

United States District Court
S. D. New York.

July 26, 1968.

Frank E. Kennamer, Jr., Asst. General Counsel, Meyer Eisenberg, Asst. Gen. Counsel, David M. Butowsky, Asst. Chief Enforcement Atty., Theodore Sonde, Attorney, Washington, D. C., for plaintiff; Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, of counsel.

Millard & Greene, New York City, for defendants Fifth Avenue Coach Lines, Inc. and Bolan; Myron J. Greene, Michael E. Mooney, Howard R. Udell, New York City, of counsel.

Goldstein, Judd & Gurfein, New York City, for defendant Muscat; Murray I. Gurfein, Albert D. Jorden, William M. Guttman, New York City, of counsel.

Garrity, Connolly, Lewis & Grimes, William R. Grimes, New York City, James Lawrence Garrity, New York City, of counsel; and William J. Kenney, Washington, D. C., for defendant Krock; Pincus, Bernstein & Seeman, New York City, for defendant Cohn; Lawson F. Bernstein, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This action, begun on October 27, 1967, is brought by the Securities and Exchange Commission pursuant to Section 20(b) of the Securities Act of 1933 (15 U.S.C. § 77t(b)), Section 21(e) of the Securities Exchange Act of 1934 (15 U.S.C. § 78u(e)) and Section 42(e) of the Investment Company Act of 1940 (15 U.S.C. § 80a–41(e)). The complaint seeks an injunction and the appointment of a receiver for defendant Fifth Avenue Coach Lines, Inc. (Fifth). When the action was begun, the complaint named as defendants Fifth and three

present or former officers and directors of Fifth, Victor Muscat, Edward Krock and Thomas A. Bolan. In February 1968 the complaint was amended to add as defendant Roy M. Cohn, a lawyer who is "of counsel" to the law firm of Saxe, Bacon & Bolan, of which Bolan is a member. That firm is general counsel for Fifth.

Plaintiff moved for a preliminary injunction. Pursuant to Rule 65(a) (2), the court advanced the trial of the action and consolidated the hearing on the motion with the trial itself. The combined hearing and trial was originally set for January 8, 1968, but adjournment proved to be necessary because of the magnitude of the task of preparation. The trial finally got under way on March 25, 1968 and was concluded on May 6, 1968.

Although no preliminary injunction has been issued, the court has maintained some control over the affairs of Fifth pending the determination of this action on the merits. At the outset of the litigation, the parties stipulated in substance that defendants would not enter into any significant transaction without first offering the Securities and Exchange Commission an opportunity to object. In addition, the court required that the net proceeds in the sum of $1,883,482.44 of the sale by Fifth in February 1968 of 113,014 shares of the common stock of Austin, Nichols & Co. Inc. be deposited in a bank account subject to withdrawal only upon order of the court. Since then the court has approved requests from time to time for withdrawal of sums for the purpose of paying tort claims and judgments against Fifth and the payment of pensions to former employees of Fifth.[1]

The complaint contains eleven counts. Ten of them are based on the premise that since October 1966 Fifth has been and still is an investment company within the meaning of the Investment Company Act and that it should have registered with the Commission under that Act but failed to do so. The complaint charges that since October 1966 Fifth, in one way or another, has violated five different sections of the Investment Company Act, Sections 7(a), 17(a), (d), 21(b), 36 and 37, and that the individual defendants have caused it to do so. At least six separate transactions are complained of. They are claimed to have violated specific sections of the Act. Other transactions are referred to here and there in the complaint and are said to have been improper. In addition, count 2 charges in general terms that since October 1966 Fifth has bought and sold securities and engaged in interstate commerce in violation of section 7 of the Act, and counts 10 and 11 repeat all previous allegations of the complaint and charge defendants with gross abuse of trust and with conversion, in violation of sections 36 and 37, respectively, of the Act.

Count 1 differs from all other counts in that it is based, not on the Investment Company Act, but on Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)) and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and Rule 10b-5 thereunder. In brief, this count charges defendants with fraud in the purchase and sale of securities and with making untrue statements of material fact and omitting to state material facts in connection with the purchase and sale of securities. The transactions complained

---

1. Furthermore, in the wholly separate action of Braasch v. Muscat, et al., now pending in this court, Judge Palmieri, by order dated February 8, 1968, appointed a Special Fiscal Agent to approve or disapprove all disbursements made by Fifth. Fifth appealed from that order. The appeal has not yet been decided. Pending that decision, the Court of Appeals, by order dated February 16, 1968, modified Judge Palmieri's order to the extent of limiting the authority of the Special Fiscal Agent to passing upon disbursements to the defendants named in that action and the firm of Saxe, Bacon & Bolan. The court also directed, however, that all other expenditures by Fifth be countersigned by a firm of independent accountants. S. D. Leidesdorf & Co. has since acted in that capacity.

of are the same as those which form the basis of the Investment Company Act counts, plus one additional transaction.

The complaint is lengthy, the testimony is extensive and repetitive, and the exhibits are numerous. Nevertheless, despite the complexity of the case, many of the basic facts are undisputed and indeed, a good many of them are stipulated. The controversy lies mainly in the inferences to be drawn from the undisputed facts and in the legal effect of what occurred. Defendants maintain that Fifth is not and never has been an investment company and hence, although concededly it has never registered as such, it was not obligated to do so. They assert, therefore, that the counts which rest upon violations of the Investment Company Act must necessarily fail. As to count 1, defendants maintain that the various transactions referred to do not constitute violations of the 1933 and 1934 Acts for the reason, among others, that these transactions do not involve the purchase or sale of "securities" within the meaning of those statutes.

Before taking up the specific transactions and the legal questions to which they give rise, a summary of background facts, most of which are uncontroverted, is essential.

### Fifth and Its Subsidiaries

Fifth is a New York corporation. It has only one class of stock, common stock of a par value of $10, of which 950,000 shares are authorized and 882,575 shares are issued and outstanding. It has some 2,300 stockholders. Its stock was traded on the New York Stock Exchange until January 1966 when the Stock Exchange suspended trading in the stock. Since then, it has been traded on the over-the-counter market.

Surface Transit, Inc. (Surface) is a wholly-owned subsidiary of Fifth. Westchester Street Transportation Company, Inc. (Westchester) is a wholly-owned subsidiary of Surface. VIP Metered Transportation Corporation (VIP) is a wholly-owned subsidiary of Fifth.

Until March 1962 Fifth and Surface each operated bus lines in New York City. Westchester operated bus lines in Westchester County. VIP, a company which provides individual limousine service, was not then in existence.

### The Condemnation Proceeding

In March 1962 the City of New York acquired by condemnation all the bus lines of Fifth and Surface. Those of Westchester, being beyond the city limits, were not condemned. They are still owned and operated by Westchester.

Fifth and Surface sought compensation in the condemnation proceeding for the properties which had been taken from them. That litigation has continued ever since and is still not finished. It raises questions which have a bearing upon the issue presented in this case as to whether Fifth is an investment company.

Fifth claimed compensation in the sum of $48,000,000 and Surface claimed $44,500,000. On August 14, 1964, the Supreme Court, New York County, awarded Fifth $16,317,297 and Surface $13,915,197, a total of $30,232,494. The court allowed interest on the awards at 4 per cent. In re Fifth Avenue Coach Lines, Inc., 46 Misc.2d 14, 259 N.Y.S.2d 313 (Sup.Ct.N.Y.Co., Hecht, J., 1964)

On July 22, 1965, the Appellate Division, one justice dissenting, affirmed the awards. In re Fifth Avenue Coach Lines, Inc., 23 App.Div.2d 463, 261 N.Y.S.2d 784 (1st Dept. 1965)

On July 7, 1966, the Court of Appeals, three judges dissenting, affirmed the awards but remanded the case to Special Term "for a determination of the value of the going concern assets as an addition to the amount heretofore awarded." Matter of City of New York (5th Ave. Coach Lines), 18 N.Y.2d 212, 273 N.Y.S. 2d 52, 219 N.E.2d 410 (1966)

The court held that the amount already awarded was "sufficient only as compensation for the value of the tangible property taken" (18 N.Y.2d at 218, 273 N.Y.S.2d at 53, 219 N.E.2d at 411), and

that the trial court had "improperly rejected the evidence proffered by the claimants as to the value of intangible going concern assets" (18 N.Y.2d at 220, 273 N.Y.S.2d at 55, 219 N.E.2d at 412). As examples of such assets, the court referred to "coach routes, operating schedules, operating records and systems of procedures and trained personnel" (18 N.Y.2d at 221, 273 N.Y.S.2d at 56, 219 N.E.2d at 413). The court held that these assets, as well as franchises, were "all going concern assets for which claimants must be duly compensated" (18 N.Y.2d at 224, 273 N.Y.S.2d at 58, 219 N.E.2d at 415).

After this decision the City took the position that no separate judgment could be entered on the award for tangibles and hence that this award could not be paid until the conclusion of further proceedings with respect to an award for intangibles. Thereupon, Fifth moved in the Court of Appeals to amend the remittitur so as to permit the entry of a separate judgment on the award for tangibles. The court, again with three judges dissenting, granted the motion on September 29, 1966. In the Matter of the City of New York—5th Ave. Coach Lines, Inc., 18 N.Y.2d 741, 274 N.Y.S.2d 349, 221 N.E.2d 774 (1966).

A separate judgment was then entered and on October 17 and 18 the award to Fifth and Surface for tangibles, including interest, was paid by the City. According to the parties' stipulation, the amount so paid was approximately $32,700,000. According to the closing statement, which is in evidence, the amount was $34,727,121.53. The discrepancy is unimportant, for it is undisputed that the lion's share of the total was paid directly by the City to creditors of Fifth and Surface who had filed liens against the award. After these liens were satisfied, Fifth and Surface were left with a total of $11,576,424.32.

In due course hearings were held in the Supreme Court, New York County, in accordance with the Court of Appeals' direction, with respect to the claim for an award for intangibles. On April 18, 1967, the court awarded Fifth $1,257,500 and Surface $1,320,000, a total of $2,577,500. Matter of City of New York (5th Ave. Coach Lines, Inc.), N.Y.L.J., April 18, 1967 p. 18 (Hecht, J.)

On January 23, 1968, the Appellate Division affirmed this award, one justice dissenting. In re Fifth Avenue Coach Lines, Inc., 29 App.Div.2d 638, 287 N.Y.S.2d 454 (1st Dept. 1968).

Thereupon both Fifth and Surface and the City appealed to the Court of Appeals. The appeal has not yet been decided by that court.

*The Change in Fifth's Circumstances*

From March 1962, when their operating properties were taken by the City, until October 1966, when the award for tangibles was paid, Fifth and Surface, who, as a practical matter, may be considered as one, were hard pressed for cash. They had obligations which had to be met, notably bonds and other indebtedness, claims and judgments for personal injuries arising out of the operation of the bus lines prior to 1962, and pensions to ex-employees. Fifth borrowed money from Mastan to pay some of these obligations. The Mastan loans outstanding as of October 17, 1966, totalled over $9,000,000. Interest and carrying charges on these loans ran over $80,000 per month.

During this period, Fifth had no real business. Its principal activity was attempting to dispose of old tort claims. Most of its few employees devoted their time to that work. Fifth substantially reduced its office staff and eventually gave up its New York City office altogether. Thereafter, it used as its office the second floor of a garage in White Plains which housed Westchester's buses.

When the award was received, however, poverty was transformed into affluence. Fifth then found itself in possession of over $11,500,000, free and clear.

Both the period before October 1966 and the period thereafter are involved in this case. Some of the transactions which plaintiff attacks occurred before October 1966. Most of them, however,

occurred afterward. The earliest transaction with which we are concerned occurred in September 1965. The latest occurred in August 1967. Thus, the entire time span involved in this case is only approximately two years.

### Control of Fifth

The situs of control of Fifth's stock is a key fact in this case. There is no doubt that prior to July 1966, control rested with a triumverate consisting of Muscat, Krock and Robert L. Huffines, Jr. These three men had been closely associated since 1958 or thereabouts. They controlled a number of different companies.

In July 1966 Cohn bought out Huffines and assumed his position in the triumverate. In 1967 Krock seems to have had a falling out with the other two, as a result of which he resigned his positions as officer and director of several of the companies with which the three were connected, including Fifth.

The control existed by virtue of an interlocking complex of corporations which was intricate, to put it mildly. The facts as to the stock ownership of these companies at various dates are stipulated, however, so that there is no dispute about it. The ownership remained substantially constant throughout the two-year period with which we are concerned here.

At the top of the pyramid was Defiance Industries, Inc. (Defiance). Muscat owned 27.3 per cent of the voting stock of Defiance on December 1, 1965 and still owned 25.2 per cent on August 31, 1967. Until July 6, 1966, Huffines owned or controlled 82,809 shares of Defiance, constituting approximately 9 per cent of the 892,894 shares outstanding.

On July 6, 1966 Huffines sold his Defiance stock to William P. Ruffa, an attorney in Saxe, Bacon & Bolan, who acted merely as nominee. Muscat acquired 20,000 of these shares, Bolan acquired 10,000 and Cohn acquired the balance,

i. e., 52,809. Shortly thereafter Cohn purchased the 20,000 shares from Muscat, thereby giving him at that point a total of 72,809. Shortly thereafter Cohn sold some of the shares on the market, with the result that as of December 12, 1966, when Defiance reported these facts to the Securities and Exchange Commission, Cohn owned 64,109 shares constituting approximately 7 per cent of the total. Thus, between them, Muscat and Cohn owned approximately 34 per cent of Defiance.

Defiance owned approximately 32 per cent of BSF Company (BSF), a registered investment company. BSF owned 9 per cent of Fifth. It also owned 20 per cent of Gray Line Corporation (Gray Line), an inactive company, which in turn owned 23 per cent of Fifth.

Surface, Fifth's wholly-owned subsidiary, owned 33 per cent of Gray Line, and Fifth itself, at least until August 1966, owned 45 per cent of Gray Line. Hence, the combined holdings in Gray Line of BSF, Fifth and Surface came to 98 per cent, while BSF and Gray Line between them owned 32 per cent of Fifth.[2]

Huffines also sold his holdings in BSF on July 6, 1966. These amounted to 18,735 shares. Bolan purchased 2,000 of these shares and Cohn purchased the remainder, i. e., 16,735 shares.

### Other Companies in the Complex

Defiance owned substantial interests in other corporations which figure in this case, including 64 per cent of TelePro Industries Incorporated (TelePro), 50 per cent of Guaranty Bank and Trust Company (Guaranty), and 15 per cent of Mercantile National Bank of Chicago (Mercantile). Moreover, BSF, itself controlled by Defiance, owned, in addition to its holdings in Fifth and Gray Line, 8 per cent of Mercantile and 57 per cent of American Steel and Pump Corporation (American Steel).

Krock, the third member of the triumverate, owned comparatively little stock.

---

**2.** In August 1966 Fifth's board of directors resolved to distribute Fifth's 45 per cent interest in Gray Line to Fifth's stockholders as a dividend. It is not clear whether this distribution was ever carried out.

He owned only one per cent of Defiance and BSF, both of which he sold in 1966. He owned few or no shares of the other companies. Krock's function in the triumverate, as will later appear, was that of a lender, rather than an investor.

Muscat and Krock were directors and officers of many of these companies. Muscat was usually the president or chairman, or both, and Krock was usually the treasurer, although he was president of Gray Line and American Steel, and chairman of Mercantile. Until July 1966, Huffines was also an officer or director of many of the companies, including Fifth. In general, Muscat looked after the operations of the companies, Krock concerned himself with financing, and Huffines attended to public relations and dealings with accountants and attorneys.

Krock resigned his posts in these companies in late 1967 and early 1968. Huffines resigned all his positions when he sold his Defiance stock. Bolan succeeded Huffines in several of these positions, as a result of an agreement reached at a conference attended by Muscat, Krock and Cohn in early July 1966.

Cohn was not an officer or director of Fifth at any time relevant here. Nevertheless, there is no doubt that he actively participated in its affairs. Saxe, Bacon & Bolan was general counsel for most of the companies, including Fifth.

### Fifth's Officers and Directors

On January 12, 1965, Muscat, who had been chairman of the board of Fifth, was elected president. He thereafter held both offices. Bolan was elected secretary. Krock became treasurer shortly thereafter. These three continued to hold these offices until 1967. They also constituted the executive committee of the board.

The officers of Surface, an inactive company, were the same. Muscat was president of Westchester. He also became president of VIP when that company was acquired by Fifth in 1965.

The board of directors of Fifth at the beginning of 1966 consisted of ten members. In addition to Muscat, Krock and Bolan, they consisted of Dr. George Moore, John L. Brunner, Robert L. Langdon, Raymond D. Murphy, Solomon S. Silbert, Edward J. Spellman and Jack L. Wolfson. Murphy was controller of Westchester. Brunner was vice president and controller of American Steel, one of the companies in the group. Silbert was a stockholder of Fifth who had been a director for some years. Langdon was a broker who was also a director of American Steel and BSF. Spellman was an officer of a textile firm. Dr. Moore was Krock's personal physician and Wolfson was Krock's son-in-law. They both lived in Worcester, Massachusetts, where Krock had his office, and participated very little in the affairs of Fifth. Indeed, Dr. Moore seems to have attended almost no meetings and evidenced no understanding whatever of the company's problems.

The same directors were re-elected at the annual stockholders' meeting held in August 1966. There has been no stockholders' meeting since. Consequently, the 1966 board continues in office, except for resignations, of which there have been some. The most important are those of Muscat and Krock.

In the spring of 1967 Muscat tendered his resignation as chairman, president and director of Fifth. It was dated March 27, 1967. It was accepted by Fifth's board of directors on May 11, 1967. Bolan was then elected chairman and president to succeed Muscat. Silbert took Bolan's place as secretary.

Muscat did not resign as president of Westchester and was still serving in that capacity at the time of the trial. On June 28, 1967, Fifth's board of directors fixed his salary as president of Westchester at $25,000 per year. Since the trial, the court has been advised by letter from counsel dated July 12, 1968 that on July 11, 1968, Muscat "was replaced as officer and director" of Westchester.[3]

3. The testimony as to Muscat's status in VIP is not entirely clear. His resignation from Fifth does not mention VIP. On June 28, 1967, Fifth's board of direc-

There is a certain mystery about the resignation of Krock. His written resignation as a "Director and Officer of Fifth Avenue Coach Lines, Inc." was dated December 7, 1966. However, the evidence establishes that he continued to act as treasurer and continued to sign checks on Fifth's bank account long after that date.

There are two sets of minutes for the meeting of Fifth's board of directors held on May 11, 1967. One version recites the acceptance of the resignations of Muscat and Krock. The other version refers only to Muscat's resignation, without any reference to Krock's. However, on June 28, 1967, the board resolved that Krock's salary, "as financial consultant for Fifth and all its subsidiaries," be fixed at $50,000. Even after this date, Krock continued to sign checks on Fifth's bank account for several months. He submitted a written resignation as consultant under date of December 13, 1967.

### The Transactions Complained Of

Three of these occurred before Fifth came into its money in October 1966. The others occurred thereafter. Clarity will be furthered by treating them chronologically, regardless of the order in which they are set forth in the complaint. Only the essential facts in each transaction will be related, and details which are unnecessary to an understanding of the issues presented for decision will be omitted.

### The Loan from Krock to Fifth in 1965

When Krock was appointed treasurer of Fifth in early 1965, he opened an account for Fifth in Worcester County National Bank (Worcester), an institution in Krock's home town with which he enjoyed cordial relations. Krock was authorized to sign checks on this account without any co-signatories. The bank

obeyed Krock's instructions with respect to Fifth's account without question. Krock received the cancelled checks from the bank and was in no hurry to forward them to Fifth's office in White Plains or to advise Fifth's accountants as to what was going on. This arrangement led to some curious results, the first of which, in point of time, involves the 1965 loan.

In April 1965 Fifth cashed a certificate of deposit which had been issued to it by Mercantile in the sum of $1,000,-000. On the instructions of Muscat as Fifth's president, Mercantile transmitted the $1,000,000 to Worcester. Worcester, on Krock's instructions, credited $10,000 of it to Fifth's checking account and issued its certificate of deposit for $990,000 dated May 3, 1965 payable to Fifth one year after date, with interest at 4 per cent. Worcester delivered this certificate to Krock who in July 1965 returned it to Worcester for safekeeping.

On July 9, 1965 Worcester, on Krock's instructions, loaned $500,000 to Fifth repayable on April 30, 1966. As security for this loan Fifth pledged with and delivered to Worcester a certificate of deposit in the sum of $500,000 issued by American Fletcher National Bank payable to Fifth on April 30, 1966.

At a meeting of Fifth's board of directors held on September 26, 1965 Muscat advised the board that Fifth needed money to meet current obligations. Either he or Krock, who according to the minutes was at the meeting, said in substance that the certificate of deposit issued by Worcester in favor of Fifth was not assignable, that it could not be pledged for a loan, and that it could not be paid before maturity.[4] According to the minutes, Krock then advised the board that he personally would lend Fifth the necessary funds. There-

---

tors fixed Muscat's salary as president of VIP at $25,000 per year. However, Bolan testified at the trial that he, Bolan, was president of VIP. Presumably Muscat must have ceased to hold this office by the end of 1967.

4. The testimony of Worcester's officers indicates that they were of the belief that Regulation Q of the Federal Reserve Board so provided. This belief was in large part incorrect. See Regulation Q; 12 C.F.R. § 217.4(d) and (e).

upon the board adopted the following resolution:

"RESOLVED, that the corporation accept Mr. Krock's offer of a loan in a sum not to exceed $900,000, which sum was to be drawn down at various times and in varying amounts as required by the corporation, it being clearly understood that on the maturity of this certificate at the Worcester County Bank, Mr. Krock would be repaid."

On October 25, 1965, Krock personally borrowed $990,000 from Worcester, payable on May 3, 1966, with interest at 4¾ per cent. Out of the proceeds of this loan Krock, on October 27, 1965, deposited $885,944.45 in Fifth's account in Worcester. This was Krock's loan to Fifth.

Worcester's certificate of deposit for $990,000 in favor of Fifth matured on May 3, 1966. The amount payable to Fifth, which included interest, was $1,-030,150. The loan which Worcester had made to Krock individually matured on the same day. On Krock's instructions, Worcester applied the proceeds of Fifth's certificate of deposit first to the payment of the principal of Krock's personal loan in the amount of $990,000 and second to the payment of interest on that loan in the amount of $24,688.12. After so doing, there was a balance of proceeds of $15,461.88. Worcester paid this to Krock by cashier's check. Krock deposited it in his own account.

Krock thereupon treated his loan to Fifth as paid, as indeed it was. At this point Krock had received $1,030,150 of Fifth's money against his loan of $885,-944.45. But this was not all. On May 2, 1966, Worcester received from American Fletcher National Bank the proceeds of the certificate of deposit which that bank had issued to Fifth. These proceeds amounted to $520,277.78. Worcester applied these proceeds first to the payment of the loan which it had made to Fifth in the amount of $500,000 and next to the payment of two days' interest

on that loan in the sum of $145.83.[5] This left a balance of proceeds of $20,131.95. Worcester paid this sum to Krock who deposited it in his individual account.

Thus, for the lending of $885,944.45 for a period of approximately six months, Krock received moneys otherwise payable to Fifth aggregating $1,050,281.95. This exceeded the principal amount of his loan by $164,337.50.

The board's resolution of September 26, 1965 said nothing about the rate of interest to be paid on Krock's loan. Fifth represented to the Securities and Exchange Commission in its annual 10–K report for the fiscal year ended December 31, 1965 that the rate of interest was to be 10 per cent. Assuming the correctness of this representation, interest at 10 per cent on $885,944.45 for a period of approximately six months would be approximately $44,297. Deducting this from the $164,337.50 leaves $120,040.50. This is the so-called "premium" which Krock received for his loan.

Krock gave a completely different version of this transaction in the course of his testimony. He testified in substance that he had purchased Fifth's certificate of deposit for $885,944.45 by agreement with Muscat and that therefore he was entitled to the full proceeds of the certificate. He denied that he was present at the board meeting on September 26, 1965 when the board approved a borrowing, not a sale, of the certificate. He had no satisfactory explanation of why he was also entitled to retain the $20,131.95 otherwise payable to Fifth from the proceeds of the American Fletcher certificate. The court does not credit this testimony which is not only at variance with all the documentary evidence in the case, but also with Krock's own affidavit filed at an earlier stage of this action.

### Fifth's Note for $85,000 to Saxe, Bacon & Bolan

On July 21, 1966, Fifth, which had not yet received its award from the City, made its promissory note for $85,000

---

5. Why only two days' interest was charged does not appear.

payable ninety days after date to the order of Saxe, Bacon & Bolan. The note was signed by Muscat as president of Fifth. Saxe, Bacon & Bolan discounted this note with Security National Bank of Huntington, Long Island (Security). To induce Security to discount it, Gray Line guaranteed payment of the note and delivered to Security as collateral 51,100 shares of Fifth's stock which Gray Line owned.

The arrangements were made by William P. Ruffa, an attorney employed by Saxe, Bacon & Bolan, who was an officer of Gray Line. Some of the documents bear Bolan's name, but the testimony is that it was Cohn who signed Bolan's name, in accordance with a standing arrangement between them. Bolan does not seem to have had any hand in this transaction at the time, as far as appears.

Security deposited the proceeds of the discounted note in the checking account maintained by Saxe, Bacon & Bolan with Security. On July 26, 1966, Ruffa sent to Security two checks drawn on Saxe, Bacon & Bolan's account and signed on behalf of Saxe, Bacon & Bolan by Daniel J. Driscoll, a member of the firm. Each check was to the order of Cohn in the amount of $25,000. One check was endorsed by Cohn to the order of Muscat. The other was endorsed by him to the order of Krock. Ruffa's letter instructed the bank to deposit the checks in the accounts of the respective endorsees. The bank did so, and charged Saxe, Bacon & Bolan's account accordingly.

The payments thus made by Cohn to Muscat and Krock represented part of what he owed them for advances which they had made to him to enable him to buy Huffines' stock in Defiance and BSF, which he had purchased earlier that month.[6]

On November 2, 1966, which was after it had received its award from the City, Fifth paid the amount of its note, with interest, to Security.

The minutes do not indicate that this transaction was ever approved by Fifth's board of directors. Moreover, the evidence is by no means convincing that Fifth received any consideration for making this payment. Bolan testified that the $85,000 was a fee to Saxe, Bacon & Bolan for work which it had done for Fifth on the condemnation suit. But no bill to support this fee was ever produced, and Saxe, Bacon & Bolan's fees for this work appear to have been fully paid by other bills which will be referred to hereafter.

The confusion which has surrounded this transaction from the beginning is evidenced by the fact that almost to the eve of trial, Fifth's accountants believed that this $85,000 was a payment by Fifth for the account of Gray Line to pay a bill rendered by Saxe, Bacon & Bolan to Gray Line for services performed for that corporation. It is now clear, however, that this explanation is erroneous, for the evidence shows that the bill to Gray Line was not rendered until June 1, 1967, and that it was paid by a wholly separate check dated May 4, 1967 drawn on Fifth's account in Worcester and signed by Krock. The amount of this bill and check was $85,000, hence the confusion between the two items. This latter payment was treated by Fifth as an advance to Gray Line.

### The Loan to Gray Line in 1966 and the $175,000 Mistake

In 1966 Gray Line was indebted to Hertz Corporation in the sum of $601,-196.26 on a debenture due on September 1, 1966. Hertz sued Gray Line and Fifth. On March 25, 1966, a stipulation was entered into in that action which provided in substance that Gray Line would pledge its 102,202 shares of Fifth's stock as security for the payment of its obligation. The stipulation further provided that if Gray Line paid this debt on September 1, 1966, the action would be discontinued, otherwise Hertz would be free to enforce its rights.

6. There is enough evidence to support an inference that it was originally contemplated that Fifth's note would be for

$35,000 and that it was increased to $85,000 in order to provide the $50,000 for Cohn to pay to Krock and Muscat.

Neither Gray Line nor Fifth had the necessary $601,196.26. Muscat and Krock were eager to raise the funds to pay this obligation, despite the fact that Gray Line, which had no business and little or no assets other than its stock in Fifth, was in itself unimportant. They wished to avoid a foreclosure by Hertz on Gray Line's stock in Fifth which would have caused them to lose control over Fifth. After apparently some procrastination, Saxe, Bacon & Bolan, on behalf of Gray Line, on August 29, 1966, attempted to borrow $601,000 from Mercantile. Mercantile declined to lend it. Guaranty, a bank 50 per cent of whose stock was owned by Defiance, agreed to advance $147,000. Krock agreed to put up the rest.

On September 1, 1966, Guaranty transmitted its $147,000 to Krock's account at Worcester. The difference between the $601,196.26 which was needed and the $147,000 provided by Guaranty, was $454,196.26. On September 1, 1966, Gray Line executed a ninety-day note to the order of Morrill & Co., the nominee of Worcester's trust department which acted as custodian of the funds of Krock's minor children. The amount of the note was not $454,196.26, it was $561,196.26. The note was secured by Gray Line's 102,202 shares of Fifth's stock.

On September 1 Worcester transmitted to Bankers Trust Company $601,196.26 for the account of Ruffa. Ruffa received the $601,196.26 and immediately paid it to Hertz in satisfaction of Gray Line's obligation. On October 20, 1966, a few days after it received payment of the condemnation award, Fifth paid Morrill & Co. the amount of the note, i. e., $561,-196.26. Fifth also paid back the $147,000 loan from Guaranty. Fifth charged both payments on its books as an advance to Gray Line.

Thus, Fifth paid $561,196.26 plus $147,000, a total of $708,196.26 in order to satisfy Gray Line's obligation of $601,-196,26. The difference is $107,000. This was the "premium." As Muscat put it, Krock was "to be paid back $561,000 * * *. There is a $107,000 premium

in the 561 * * * so he was actually going to lend $454,000."

According to Gray Line's minutes, Gray Line's directors, consisting of Muscat, Krock, Langdon, Spellman and Wolfson, at a meeting held on August 31, 1966, authorized the borrowing of the $147,000 from Guaranty and the $561,-196.26 from Morrill. The minutes do not refer to any premium. Muscat testified that the directors knew that the obligation to Hertz was only approximately $601,000 and since they authorized the borrowing of a total of $708,000, they must have known that the difference of $107,000 was a premium.

Muscat testified that he realized that there would be a premium. He said that he did not consider it excessive because it might turn out that Fifth did not receive payment of the award for some two years and hence could not pay back Morrill for two years, in which event the $107,000 would be reasonable interest for a loan for that period. Of course, the Court of Appeals had affirmed the award for tangibles almost two months before this transaction occurred. It is true, however, that it was not until after the transaction, i. e., on September 29, 1966, that the Court of Appeals directed immediate payment of the award. There is thus this much plausibility to this explanation.

The $175,000 mistake was a bit of confusion which came about because Muscat made a belated effort to join Krock in advancing the funds to Gray Line to pay Hertz. He did so, according to his testimony, because he did not think it fair that Krock should have "the whole burden of what he and I both felt were undesirable loans."

On or about September 15, 1966, some two weeks after Hertz had been paid, Muscat sent to Fifth three checks totalling $175,000. One was signed by his mother and the other two were signed by the trustees of employees profit sharing trusts of two corporations owned by Muscat. Muscat requested Fifth to transmit the $175,000 to Krock as Muscat's share of the Morrill loan "because

I was substituting my money for theirs." Fifth sent to Krock a check to the order of Morrill for $175,000 and Krock turned it over to Morrill.[7]

When Fifth paid Morrill $561,196.26 on October 20, 1966, as previously related, it did not deduct the $175,000. Thus, all in all, Fifth paid Morrill (i. e., Krock) $175,000 too much. Krock eventually recognized that there had been a "duplicate payment." He repaid the $175,000 to Fifth shortly after this action was begun.

Krock, of course, knew that Muscat had contributed $175,000 to the loan. When the loan was paid off by Fifth, Krock first paid back the $175,000 to Muscat. Subsequently, he paid Muscat the latter's share of the premium, apparently approximately $39,000. Fifth's 10–K report to the Securities and Exchange Commission for the year ended December 31, 1966, in briefly describing this transaction, states that "Victor Muscat and Edward Krock received a premium of approximately $102,000 [sic] in proportion to their respective participation in the loan."

### The Deposits in Geoffrey's Bank, Belgium, and Banco Suizo-Panameno, Panama

When, in October 1966, Fifth found itself in possession of approximately $11,500,000 free cash as a result of the receipt of the condemnation award, it proceeded promptly to distribute this cash among various banks. The greater part, approximately $7,500,000, was deposited in Worcester, subject to Krock's control. The balance of some $4,000,000 was deposited in the first instance in a number of different banks. Two of these deposits, which were arranged by Cohn, have provoked considerable controversy in this action, although neither is made the subject of a separate count in the complaint.

The first of these was a deposit of $500,000 in Geoffrey's Bank, Belgium, made on October 18, 1966, the very day that Fifth received the money from the

City. An officer of Geoffrey's Bank is A. Newman, a friend of Cohn's with whom he had had certain business dealings. A few days after this deposit, i. e., on October 31, 1966, Geoffrey's Bank transmitted $100,000 to Cohn who deposited this sum in his personal bank account. The coincidence of dates not unnaturally aroused the suspicions of the Securities and Exchange Commission. But Cohn testified that the $100,000 was a payment of a fee due him from Newman on some other transaction, and there is no evidence to the contrary.

At an early stage of this action, the court directed Fifth to authorize Geoffrey's Bank to inform the Securities and Exchange Commission as to the status of the $500,000 deposit. The result was a letter from Geoffrey's Bank, signed by Newman, dated March 19, 1968, addressed to the Belgian Banking Commission and forwarded by it to the Securities and Exchange Commission. The letter states that the $500,000 is on deposit to Fifth's credit in the bank for a period of two years at six per cent interest and that no withdrawals have been made from the account.

The other deposit, in the amount of $250,000, is more mysterious. Although a great deal of testimony was devoted to this subject, it was never fully explained.

It appears that Walter Germann owned or controlled a bank in Switzerland named Bank Germann which controlled a bank in Panama named Banco Suizo-Panameno (Suizo). In August 1966, Germann was held in contempt and fined by this court for failure to appear as a witness before the grand jury which was investigating Bank Germann and Suizo with a view to determining whether these banks were lending their facilities to United States citizens to facilitate frauds upon the United States with respect to income tax laws and security regulations. Cohn knew of this, for on September 23, 1966, he was served with an order of this court restraining him from transferring any

---

7. This check "bounced" for insufficient funds, but after a series of transactions which it is unnecessary to recount in detail, Fifth eventually made it good.

property of Germann in his possession. He was also served with a subpoena requiring him to report whether or not he possessed any property of Germann. He filed a negative response to this subpoena on October 3, 1966.

On November 15, 1966, Cohn, on behalf of Fifth, caused to be delivered to one E. A. Morales a cashier's check of Guaranty in the sum of $250,000 payable to "E. A. Morales, Vice President." Morales was apparently a vice president of Suizo at the time. The endorsement on this check shows that it was deposited in the Union Bank of Switzerland in Basel. Morales delivered to Cohn a letter dated November 15, 1966 which purported to acknowledge receipt of the $250,000 as a deposit by Fifth in Suizo. The letter is garbled and part of it makes no sense.

Plaintiff contended that this transaction was not in fact a deposit in Suizo, but rather was a payment of Fifth's money to Germann. The evidence is insufficient to prove this contention. It appears that although the check was deposited in Switzerland and apparently eventually reached Bank Germann there, Bank Germann in December 1966 instructed Suizo to credit Fifth with $250,000. Thereafter Germann committed suicide. His Bank Germann failed and eventually Suizo also failed and an "interventor," Obarrio, was appointed for it by a Panamanian court on April 13, 1967. Obarrio testified that although Suizo received the credit advice from Bank Germann, it never received the $250,000. This testimony is contrary to Obarrio's letter dated July 11, 1967 to Fifth's accountant which referred to a deposit by Fifth of $250,000 "in our bank."[8] In any case, the least that can be said is that as of the moment, it is highly uncertain whether Fifth will ever recover this $250,000.

*Fifth's $300,000 Loan to Saxe, Bacon & Bolan*

On November 4, 1966, which was some two weeks after Fifth received the condemnation award, Saxe, Bacon & Bolan made and delivered its promissory note, signed by Bolan, in the sum of $300,000 payable to the order of Fifth ninety days after date with interest at 5¾ per cent. On November 8 Muscat, as president of Fifth, instructed National Bank of Secaucus, where Fifth then had an account, to issue its cashier's check to Fifth in the sum of $300,000. The bank did so. The check was deposited in Fifth's account in Security. On November 9 Fifth drew a check on its account in Security, signed by Muscat, to the order of Saxe, Bacon & Bolan for $300,000. On November 9 Muscat wrote to Security instructing it to deposit this check in the account of Muscat. Apparently Security did not comply but instead deposited the check in the account of Saxe, Bacon & Bolan.

On the next day, November 10, Saxe, Bacon & Bolan drew a check signed by Bolan on its account in Security for $300,000 payable to the order of Cohn. Cohn endorsed the check to the order of Muscat and delivered it to Muscat. It was then deposited in Muscat's account in Security. There is no doubt whatever that this payment was made by Cohn to repay a loan which had been made to him by Muscat to enable Cohn to buy Huffines' Defiance and BSF stock.

Saxe, Bacon & Bolan has never paid any part of its note to Fifth in cash. Instead, the firm has made charges to Fifth for legal services from time to time and has offset these against its obligation on the note. On February 1, 1967 Saxe, Bacon & Bolan rendered a bill to Fifth in the amount of $75,000 for services rendered in December 1966 and January 1967 in connection with Fifth's acquisition of stock of Mercan-

---

8. The evidence establishes that after the collapse of Suizo, an attorney employed by Saxe, Bacon & Bolan, acting on the advice of a Panamanian attorney to the effect that citizens of Panama enjoyed a preferential position under Panamanian law in insolvency proceedings, fabricated a document to make it appear that Morales was the beneficial owner of this deposit and caused this document to be filed with the Panamanian court.

tile.[9] On May 1, 1967 the firm rendered a bill to Fifth in the amount of $35,000 for services rendered in the spring of 1967 with respect to conferences with Fifth's accountants and the Securities and Exchange Commission.

In addition, on May 2, 1967, Saxe, Bacon & Bolan instructed Murphy (who handled accounting matters for Fifth) to credit against the firm's note a charge of $93,000 for Fifth's fee for its work on the condemnation case. This was the full amount of the fee to which Saxe, Bacon & Bolan was entitled under the terms of its written retainer. The total of these bills and charges is $203,000. Taking them at face value, this leaves $97,000 still owing on the principal amount of the note. There is nothing to indicate that Saxe, Bacon & Bolan has ever paid Fifth any interest on the note.

### Fifth's Sale of Gateway Stock to Gray Line

On December 15, 1966, Fifth entered into a written agreement with William C. Howell and others to purchase from them 26,080 shares of the common stock of Gateway National Bank of Chicago (Gateway) at a price of $27.50 per share, making a total of $717,200. The agreement was signed for Fifth by Ruffa as vice president. These shares constituted more than 60 per cent of Gateway's outstanding stock. The agreement provided for an immediate closing to take place on December 15 and further provided for an immediate meeting of Gateway's board of directors at which the board would elect Bolan and Brunner directors of Gateway.

The closing took place and Fifth acquired the stock. Thereafter Saxe, Bacon & Bolan decided that since Fifth already owned or was about to acquire a sizable block of stock in another national bank, Mercantile, federal laws (i. e., the Bank Holding Company Act, 12 U.S.C. §§ 1841, 1842) prohibited it from owning Gateway stock as well. Thereupon, on January

9, 1967, Fifth entered into a written agreement with Gray Line to sell the 26,080 shares of Gateway to Gray Line at $27.50 per share, the same price that Fifth had paid for it. This agreement was signed for Fifth by Krock as treasurer and for Gray Line by Ruffa as vice president. Gray Line, a company which, as previously related, had no business and no substantial assets except for its holdings of Fifth's stock, agreed to pay Fifth the purchase price of $717,200. No time for payment was fixed. No provision for security for payment was made.

Fifth delivered the stock to Gray Line. Gray Line did not pay for it.

On July 13, 1967, an amendatory agreement was made between Fifth and Gray Line, signed for Fifth by Murphy and for Gray Line by Ruffa. This agreement provided that Gray Line would pay the price by paying $71,720 in cash and by delivering ten promissory notes, payable semi-annually, for the balance of $645,480. Gray Line did not pay the cash and did not deliver the notes.

This was how matters stood when this action began. Thereafter, on December 19, 1967, a further amendatory agreement was entered into, signed for Fifth by Bolan and for Gray Line by one Goldstick. This document recited that Gray Line "is not in a position to make payment in accordance with the terms of the amendment of July 13, 1967." It went on to provide that Gray Line would deliver to Fifth the 26,080 shares of Gateway stock as security for the payment of the purchase price. It further provided that if Gray Line should sell the 26,080 shares, or any part thereof, it would pay Fifth the price out of the proceeds of the sale.

### Fifth's Loan to American Steel

On January 20, 1967, Saxe, Bacon & Bolan, acting for "clients to be disclosed," entered into an agreement with Maurice M. Glatt and others to buy from them

---

9. After this bill was rendered, Saxe, Bacon & Bolan on February 3, 1967 executed a new note for $225,000, i. e.,

$300,000 less the bill of $75,000. It was for one year with interest at 5¾ per cent.

2,475½ shares of the stock of University National Bank of Chicago (University) for $975 per share, making a total of $2,413,612.50 payable $100,000 before February 1, 1967 and the balance at the closing to be held on February 28, 1967. Cohn signed the agreement for Saxe, Bacon & Bolan.

On February 23, 1967, an amended and supplemental agreement was entered into. It recited that Saxe, Bacon & Bolan had disclosed that the clients for whom the firm was acting were Fifth and American Steel. It provided that American Steel would buy 1,885½ of the 2,475½ shares and that Fifth would buy the balance, i. e., 590 shares.[10] The price was reduced from $975 to $940 a share, making a total of $2,326,970 payable on February 28, 1967. The agreement was signed for Fifth by Brunner and Bolan and for American Steel by Brunner and Ruffa. On February 28, 1967 Fifth borrowed $1,800,000 from Security on Fifth's promissory note payable in eleven quarterly installments of $50,000 each until December 1, 1969 and a final installment of $1,250,000 on March 1, 1970, with interest at 6¾ per cent. On the same day Fifth loaned $1,800,000 to American Steel on the latter's note, payable in the same manner as Fifth's note to Security, but with interest at 8 per cent. Fifth instructed Security to deposit the $1,800,000, which it had loaned to Fifth, in American Steel's account. American Steel then completed the purchase of the University stock.

As collateral for the repayment of its obligation to Security, Fifth pledged American Steel's note, the 1,880½ shares of University stock which American Steel had purchased, the 595 shares of University stock which Fifth had purchased, and in addition, 20,000 shares of Mercantile stock. On top of all this, Fifth undertook with Security to pay to it within five days after receipt the full amount of any award received by Fifth and Surface as a result of the condemnation proceedings, over and above legal fees and expenses. This must have referred to the future award for intangibles, for the award for tangibles had been received some months before.

Previously, on October 14, 1966, Fifth and Surface had entered into an agreement with the Transport Workers Union pertaining to the pension fund for their former employees. That agreement provided that neither Fifth nor Surface would "pledge or otherwise encumber as security for any borrowing by the Companies except in the normal course of business, their claims for intangibles."

The evidence shows that the reason for this transaction was that American Steel was not in a position to borrow the necessary funds itself, being already in debt to Franklin National Bank. Fifth therefore made its credit available to American Steel, charging American Steel slightly more interest than it was obligated to pay to Security. Apparently there was some thought that American Steel would be able to meet its obligation to Fifth out of the dividends which American Steel would receive on its University stock. This has not proved to be the case. On December 4, 1967 Brunner, as vice president of American Steel, wrote to Krock stating that "up to the present, the loan is not self-liquidating."

American Steel was unable to make the payment on its note due to Fifth on December 1. It paid this installment, however, in January 1968.

*Krock's $427,500 Commitment Fee*

On December 7, 1966, Fifth made a public tender offer to buy 260,000 shares of the common stock of Austin, Nichols & Company, Incorporated (Austin, Nichols) at $20 per share. The offer stated that Fifth desired to acquire at least 51 per cent of Austin, Nichols' outstanding stock. There were approximately 518,000 shares of common stock outstanding, plus some preferred stock.

The offer originally expired on January 6, 1967, but was extended to February 10. Franklin National Bank was

10. As it turned out, American Steel acquired 1,880½, not 1,885½, and Fifth acquired 595 instead of 590.

the depositary to whom Austin, Nichols' shareholders were invited to tender their stock. Fifth acquired and paid for 88,748 shares pursuant to this offer.

On March 10, 1967, Fifth made a second tender offer to purchase 175,000 shares of Austin, Nichols common stock at $27.50 per share. The offer originally expired on March 24 but was extended until April 21. Franklin National Bank was again designated depositary. The offer stated that Fifth had "undertaken to supply the requisite funds to Franklin National Bank."

Krock orally agreed with Muscat that Krock would provide the funds. On March 1, 1967, Krock wrote to Muscat the following letter, which he testified he composed himself, using a similar letter in some other transaction as a model:

"Through me, Edward Krock, Morrill & Company commits themselves to loan Fifth Avenue Coach Lines, Inc., $3½ million on the following terms and conditions:

Condition: Upon delivery of 51% of Austin, Nichols & Company Common stock listed on the New York Stock Exchange.

Rate: Commitment fee of $427,500 including interest. No matter whether or not this amount is taken down.

Terms: One year from date—Expiring April 1, 1968

Amortization of Interest: Full payment in advance

Security: 51% of Austin, Nichols Company Common stock and deposit of additional security satisfactory to Morrill & Company to maintain margin of 50% of market value.

Other: Personal guaranty of Edward Krock and others as are deemed necessary as well as security instruments and also loan agreements as may be deemed necessary by Special Counsel.

Whether or not this financing is consummated the commitment fee will be paid, as well as to pay all fees of Special Counsel and other fees which may arise."

———————◆———————

On March 14, 1967, Krock wrote to Franklin National Bank stating:

"In accordance with my conversation about ten days ago regarding the Austin Nichols tender, I will guarantee personally that the funds will be at your bank if we accept the tender."

Krock testified, without contradiction, that he put himself in a position to fulfill this guaranty by instructing Morrill & Co. to sell municipal bonds held in the custodian accounts of Krock's minor children.

On March 10, 1967, the day that the tender offer was issued, Krock withdrew $427,500 from Fifth's account in Worcester and paid it to Worcester's trust department for deposit in the custodian accounts of his children.

The second tender offer was not very successful. The evidence does not specify exactly how many shares were acquired, but the number could not have exceeded 17,000.[11] The total acquired on both tenders fell far short of 51 per cent. Fifth was able to pay for the stock ac-

11. As of July 31, 1967, Fifth held 105,538 shares of Austin, Nichols common. It had acquired 88,748 of this on the first tender. Apparently it did not sell any in the meantime.

quired on the second tender, as well as the first, without drawing upon Krock or Morrill & Co. for any funds.

In the summer of 1967 Fifth negotiated with Axe-Houghton Fund A (Axe-Houghton) and certain others to purchase 58,285 shares of Austin, Nichols common stock at a price of $35 per share, plus a small amount of preferred. If this purchase had been consummated, Fifth still would have owned only approximately 25 per cent of Austin, Nichols common. There is some rather inconclusive testimony to the effect that Krock orally agreed to modify his commitment letter of March 1 so as to agree that he would provide the necessary funds to complete the Austin, Nichols purchase even though this did not involve the acquisition of 51 per cent of the common stock.

The proposed transaction with Axe-Houghton required the approval of the Securities and Exchange Commission because Axe-Houghton was a registered investment company. After taking testimony on the subject, the Commission denied the application by order dated December 27, 1967.

There have been no more tender offers. Fifth acquired some additional Austin, Nichols stock from other sources. Finally, after this action was begun, Fifth sold all its holdings in Austin, Nichols stock amounting to 113,014 shares to a purchaser in no way connected with these defendants at a price of $26 per share. This court approved that sale by two orders dated February 15 and February 20, 1968 and, as previously stated, directed that the proceeds be deposited in a bank account in New York subject to withdrawal only upon approval of the court.

Neither Krock nor Morrill & Co. has ever been called upon to lend to Fifth any part of the $3,500,000 referred to in the letter of March 1, 1967. The commitment embodied in that letter expired by its terms on April 1, 1968. Neither Krock nor Morrill & Co. has ever returned to Fifth any part of the $427,500 commitment fee.

### TelePro

TelePro is a small manufacturing company in New Jersey. Defiance owned 64 per cent of its stock. In the spring of 1967 it badly needed funds. Silfen, a lawyer employed by Saxe, Bacon & Bolan, was in charge of raising them.

Krock, Muscat and Cohn agreed to lend TelePro a total of $225,000, of which Muscat was to put up $112,500, Krock $75,000 and Cohn $37,500. Krock undertook to advance the funds in the first instance for all three, subject to later reimbursement by them. This was purely an individual undertaking on the part of these three lenders. Fifth had no concern with it.

On April 3, 1967, Krock instructed Worcester to transmit $152,500 from Fifth's account to Camden Trust Company for the account of TelePro. Worcester carried out these instructions. At the same time, on Krock's instructions, Worcester transmitted an additional $72,500 from the account of one of Krock's children.

Cohn paid Krock $37,500 as his share of the loan. Muscat paid his $112,500 by a check from the trustees of the employees' profit-sharing trust of one of his companies. On May 4, 1967, Krock instructed Silfen to issue a note to Muscat for $112,500, one to Cohn for $37,000 [*sic*, $37,500] and "balance of note to me."

Eventually it came to light that Krock had used $152,500 of Fifth's money in this transaction. He finally restored $100,000 to Fifth's account. He has never restored $52,500. He testified that he considered himself entitled to retain this $52,500 as part of the "premium" on his 1965 six months' loan to Fifth of $885,000 on which he had already received a premium of $120,000, as previously related.

There is a square conflict between the testimony of Krock and Muscat as to whether Muscat knew that the $152,500 was to be taken from Fifth's account. The court accepts Muscat's version and finds that he did not know. There is no

evidence that Cohn knew of it until afterward.

### Other Withdrawals by Krock from Fifth's Account at Worcester

These transactions are not made the basis of separate counts in the complaint. There was considerable testimony about them, however, and they have relevance to the issues to be decided.

The first of these in point of time was referred to at the trial as the "$135,000 mistake." It involved a series of withdrawals and deposits which may be briefly summarized as follows:

On January 24, 1967, Krock, as treasurer of Fifth, drew two checks, one for $90,000 and one for $45,000, i. e., a total of $135,000, upon Fifth's account with New England Merchants National Bank in Boston. Each was payable to the order of Surface. They were deposited on the same day in an account in the name of Surface in Worcester. On the same day Krock directed Worcester to transfer $135,000 from Surface's account to Defiance's account with Worcester. Worcester complied with these instructions. Then, as an officer of Defiance, Krock drew checks on Defiance's account totalling $135,000 to his own order. Apparently Defiance owed him $135,000 on some transaction having nothing to do with Fifth. Finally, on April 3, 1967, he restored the $135,000 to Fifth's account in Worcester. Later on the same day, he instructed Worcester to charge that account with the transfer of $152,500 to TelePro, as recounted above.

The other transactions were not claimed to be "mistakes." They consisted, to put it simply, of large transfers of cash by Krock from Fifth's account in Worcester to Krock's own personal account for reasons that are of dubious validity, to say the least. These withdrawals occurred in the summer of 1967 after Krock had apparently had a falling out with his colleagues in the triumvirate. They were accomplished by checks signed by Krock after his resignation as treasurer of Fifth had been accepted on May 11, 1967.

Krock was authorized and permitted by Fifth to sign checks, without countersignature, on Fifth's account in Worcester, even after he ceased to be treasurer. On July 24, 1967, Fifth's board resolved that checks on the account in Worcester should require the countersignature of Ellenbogen, Fifth's new treasurer, in addition to Krock. On September 8, 1967, the board removed Krock as a signatory.

The dates and amounts of the checks and the reasons put forth by Krock to justify these payments of Fifth's funds to himself are as follows:

| Date | Amount | Reason |
|---|---|---|
| July 21, 1967 | $22,500 | Reimbursement of office expenses for three years. |
| July 27, 1967 | 22,500 | Reimbursement of travel expenses. Explanation later changed to reimbursement of office expenses for an additional three years. |
| August 8, 1967 | 35,000 | Reimbursement for legal fees. |
| August 8, 1967 | 20,833.30 | Consultant's fee for five months in advance—August to December 1967. |

### The Breakdown in Fifth's Accounting

In the short space of some seven months between October 1966 and May 1967, Fifth's record keeping deteriorated to a state bordering on chaos. A primary cause of this condition lay in the

fact that Fifth's most important bank account was in Worcester, in sole charge of Krock, to whom Worcester forwarded the bank statements and cancelled checks. Krock did not keep the limited bookkeeping staff in Fifth's White Plains office promptly informed as to what he had done. Another cause arose from the fact that many important transactions were carried out on Fifth's behalf by lawyers in Saxe, Bacon & Bolan's office who were prone to make mechanical mistakes. There is evidence of several of these which need not be recounted in detail.

Another important factor consisted of the complexity of Fifth's financial arrangements, seemingly quite unnecessary for a company which had no operating business. As of August 4, 1967, Fifth had accounts in nineteen different banks. The banks were located in various parts of the country from Chicago to Boston. Two of them were in foreign countries. Only six were in New York. Funds were transferred from one bank to another, sometimes with bewildering frequency. Many of Fifth's transactions were consummated by means of bank cashier's checks and wire transfers rather than by checks drawn in a normal fashion.

The result of all this was that in the spring of 1967 Arthur Andersen & Co., Fifth's independent auditors, threw up its hands. On June 16, 1967 Andersen refused to certify Fifth's financial statements for 1966, stating that because of "weaknesses in internal control over financial transactions, we have not been able to satisfy ourselves as to the completeness of the information in the financial statements and notes thereto relating to transactions from December 31, 1966 to the date of this report." Andersen had tried for some months, without success, to obtain satisfactory explanations of various transactions for which Fifth's records afforded no adequate explanation.

Not the least of Andersen's difficulties in attempting to verify transactions arose from the fact that there was frequently no record of the transactions

in the board minutes. After Andersen's refusal to certify, an effort was made to remedy this situation retroactively.

A board meeting was held on June 28, 1967. Only four directors were present, Silbert, Spellman, Wolfson and Brunner. Cohn also attended. According to the minutes, of which there are two different versions, there was a discussion of the Austin, Nichols situation, including Krock's commitment fee of $427,500. The board adopted a resolution with respect to this commitment fee, but the directors are in disagreement as to whether or not it was approved. It seems tolerably clear that at least some members of the board believed that if Krock was not obligated to lend any of the money pursuant to this commitment, he should be asked to return at least a portion of his fee.

According to the minutes, the following took place at this meeting:

"Mr. Cohn discussed with the members of the Board that there had occurred several errors in the Company's banking statements, whereby monies had been mistakingly [sic] credited to the statements of various other companies as between Fifth Avenue, Defiance Industries and TelePro. On January 24, 1967, $135,000 was inadvertently credited to the Defiance account and debited to the company's account and returned to the company on April 4, 1967 when the matter was brought to the company's attention. On April 3, 1967, a credit to the account of TelePro in the sum of $152,500 from the account of Fifth Avenue was likewise a mistake and as soon as this was made known to the company, steps were being taken to have the mistake rectified."

The minutes of this meeting also contain the following passage which is worth quoting in full:

"There was discussion of Arthur Andersen's preliminary financials indicating possible salary overpayments to Messrs. Krock and Muscat during 1966 as a result of the accrued deferrals before the tangibles award, etc.

and the possible duplicate return of payment in connection with the loan by Messrs. Krock and Muscat to the Hertz Corporation in September, 1966, and the payment of the premium of approximately $104,000 to Messrs. Krock and Muscat in connection with said loan, it was unanimously

RESOLVED, that said premium be ratified and approved, and that any overpayments or duplicate payments to Messrs. Krock or Muscat be treated as advances against 1967 salary, and be deducted therefrom, and if any balance is outstanding in favor of the Corporation after said deduction by December 31, 1967, it is to be paid in full to the Corporation on or before that date; and that in connection with loan or purchase of certificates of deposit by Mr. Krock to raise funds for corporation when no other financing sources were available the Board ratified the payment to Mr. Krock of the accrued interest on the certificates from the two banks from which said certificates were purchased, in addition to the bonus."

As previously mentioned, Bolan was elected president of Fifth on May 11, 1967. Thereafter he was out of the country for a time on business and did not attend the June 28, 1967 meeting. Upon his return, he called a board meeting for July 17. He attended it, together with Spellman and Murphy, and according to the minutes Wolfson attended "by telephone."

Representatives of Arthur Andersen were present. At Bolan's request they submitted a memorandum outlining the weaknesses in internal control. Bolan said that he would take steps to "centralize" Fifth's operations.

The minutes then recite that Murphy submitted to the directors "a list of transactions by the Corporation concerning which he stated that Arthur Andersen had suggested obtaining board approval. A copy of said list is appended to the minutes."

Thereupon, according to the minutes, the following resolution was adopted:

"RESOLVED that the transactions set forth on the list submitted by Mr. Murphy and appended hereto be and they hereby are approved, ratified and affirmed."

The minutes recite that Bolan did not vote on so much of this resolution as pertained to Saxe, Bacon & Bolan transactions. As to these, therefore, there seem to have been only two directors voting, unless Wolfson voted by telephone, and only three directors voting as to all other transactions.

The "list appended to the minutes" is a longhand list prepared by Murphy of ten pages entitled "Final Listing of Unsupported Disbursements." Under this heading there appears a great variety of items ranging from payments of $3 and $25.30 up to the $85,000 to Saxe, Bacon & Bolan, the $152,500 taken by Krock from Fifth's bank account to send to TelePro, the item of $175,000 labeled "Worcester County National," the $135,000 mistake labeled "cash transfer to Defiance Industries (returned 4/3/67 to Fifth)," and a whole batch of payments to Saxe, Bacon & Bolan of amounts ranging from $1,261.60 to as high as $20,000.

On July 24, 1967 Fifth's board held another meeting, attended this time by four directors, Bolan, Spellman, Murphy and Brunner. Four new directors were elected, James F. Healy, C. Joseph Hallinan, John F. Lang and Joseph Keating.[12]

According to the minutes Bolan stated that he felt that the solution to the corporation's problem "would be to have all of the Corporation's financial operations centered in one office." Stanley Ellenbogen, a certified public accountant, was elected treasurer.

Resolutions were adopted with respect to signatories on the corporation's bank accounts, as previously mentioned.

12. None of these new directors testified at the trial.

The directors also resolved that the annual meeting of stockholders should be held "as quickly as possible after the approval of proxy statements." No such meeting has been held. Apparently Fifth encountered some difficulties with the Securities and Exchange Commission in obtaining approval of its proxy material.

On March 18, 1968, approximately one week before the trial of the present action began, Fifth began an action in the Supreme Court, New York County, against Krock. This action was removed to this court and is still pending. The complaint in that action seeks recovery of (1) the $427,500 commitment fee; (2) cash withdrawn in 1967 by Krock from Fifth's bank account in Worcester totalling approximately $123,000, the principal items of which have been mentioned hereinabove; (3) interest on the duplicate repayment of $175,000; (4) the $52,500 transmitted by Krock to Tele-Pro which he has not yet repaid.

### *Fifth's Status under the Investment Company Act*

The Act sets forth two definitions of an investment company which conceivably could apply here. Plaintiff claims that both apply. Defendants claim that neither applies.

Section 3(a) (1) defines the term as any issuer which:

"(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities * * *."

Section 3(a) (3) defines it as any issuer which:

"(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."

Both sections employ the word "securities." Section 3(a) (3) also uses the term "investment securities." Section 3(a) (3) defines this latter term as follows:

"As used in this section, 'investment securities' includes all securities except (A) Government securities, (B) securities issued by employees' securities companies, and (C) securities issued by majority-owned subsidiaries of the owner which are not investment companies."

This definition refers the reader to the definition of "security" which is contained in Section 2(a) (35) of the Act. Because of its importance in this case, this definition, although long and cumbersome, must be quoted in full. It reads:

"(35) 'Security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

The definition of "value" contained in Section 2(a) (39) of the Act is also relevant. As far as pertinent, it reads as follows:

"'Value', with respect to assets of registered investment companies * * * means—

(A) as used in sections 3 * * * of this title, (i) with respect to securities owned at the end of the last preceding fiscal quarter for which market quotations are readily available, the market value at the end of such quarter; (ii) with respect to other securities and assets owned at the end of the last preceding fiscal quarter, fair

value at the end, of such quarter, as determined in good faith by the board of directors; and (iii) with respect to securities and other assets acquired after the end of the last preceding fiscal quarter, the cost thereof * * *." [13]

Section 3(b) of the Act must also be considered. Section 3(b) (1) provides:

"(b) Notwithstanding paragraph (3) of subsection (a), none of the following persons is an investment company within the meaning of this title:

(1) Any issuer primarily engaged, directly or through a wholly-owned subsidiary or subsidiaries, in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities."

Section 3(b) (2) creates a procedure by which a company may seek an order of the Commission exempting it from the Act. As far as pertinent, it provides as follows:

"(b) Notwithstanding paragraph (3) of subsection (a), none of the following persons is an investment company within the meaning of this title:

* * * * * *

(2) Any issuer which the Commission, upon application by such issuer, finds and by order declares to be primarily engaged in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities either directly or (A) through majority-owned subsidiaries or (B) through controlled companies conducting similar types of businesses. The filing of an application under this paragraph by an issuer other than a registered investment company shall exempt the applicant for a period of sixty days from all provisions of this title applicable to investment companies as such."

Section 3(c) of the Act enumerates various types of companies which, notwithstanding Sections 3(a) and 3(b), are not considered to be investment companies within the meaning of the Act. None of these exceptions is pertinent in this case.

There is very little judicial authority on the questions which the court is called upon to decide here. Plaintiff relies almost entirely on decisions and "releases" of the Securities and Exchange Commission. Such material, although of interest to the court, can hardly be determinative in a case in which the Commission is itself a party litigant. The court must thus make up its mind on issues as to which there is no controlling precedent.

### Section 3(a) (1)

It has been said that Section 3(a) (1) describes the "orthodox investment company," i. e., a company that knows that it is an investment company and does not claim to be anything else, whereas Section 3(a) (3) "catches the inadvertent investment company," i. e., a company which does something else but suddenly comes up against the 40 per cent test. See Kerr, The Inadvertent Investment Company, 12 Stan.L.Rev. 29, 32 (1959–60).

The court is not persuaded that this attempted distinction is wholly sound. Section 3(a) (1) says that a company is an investment company if it *is* engaged primarily in the business of investing, reinvesting or trading in securities, or *holds itself out* as being engaged primarily in that business, or *proposes* to engage primarily in that business. (Italics supplied.) "Holding out" and "proposing" imply intent, but "is" does not necessarily imply it. It would seem to be possible for a company to find itself at a given point in time to be actually engaged primarily in this

---

13. It will be noted that this definition literally applies only to "registered" investment companies. This makes no sense, for the definition must be employed in determining whether an alleged invest-ment company should be required to register. Plaintiff says that this anomaly is due to inadvertent draftsmanship. Defendants do not contend otherwise.

business, even though it originally did not intend to be so engaged. The key word is "primarily." To determine whether a company is engaged primarily in the business of investing, its total activities of all sorts must be considered.

As has been pointed out earlier in this opinion, between March 1962 and October 1966, Fifth itself, as a practical matter, was not engaged in any business. It was merely marking time until it received payment of the condemnation award. Through Westchester, a subsidiary of a subsidiary, it was engaged in operating a bus line in Westchester County. Since that was its only business, it must have been its "primary business" during that period, and although carried on indirectly, the company at that point would seem to have been specifically excluded from investment company status by Section 3(b) (1) of the Act. In any event, no one claims that before October 1966 Fifth was an investment company.

Plaintiff says, however, that Fifth became one in October 1966, at the moment that it received the award. The court does not agree. The mere possession of $11,500,000 in cash does not make a company an investment company. It is necessary to examine Fifth's activities thereafter to see what it did with the cash, in other words, to see in what business it became primarily engaged.

In fairness, it should be noted that plaintiff's contention that Fifth became an investment company immediately in October 1966 is based in part on the verbs "holding out" and "proposes," rather than the "is" in Section 3(a) (1). This has reference to the fact that in the President's Letter dated July 28, 1966, in Fifth's annual report for 1965, Muscat stated:

"As soon as the first monies are received from the City of New York the Surface mortgage bondholders will be paid in full, and the Company intends to make proper and advantageous investments for the benefit of the Company."

Furthermore, at the annual meeting of stockholders held on August 10, 1966, Cohn read a statement of Muscat which said:

"There are bargains available today in the form of investments in transportation, in related fields, and in brand new fields—bargains which others cannot take advantage of because they do not have the cash available.

We have been actively exploring several of these opportunities and we will be ready to move forward boldly when the funds are paid over to us.

We have waited more than four years. But we will be in a position to put the money to work profitably for you as soon as it is received."

■ These statements are predictions as to what Fifth plans to do in the future. They are too general in nature to justify a finding that they amounted to such a "holding out" or "proposing" that Fifth would engage *primarily* in the business of investing as to require the conclusion that Fifth became an investment company immediately when the funds were received.

■ When Fifth first received the $11,500,000, it deposited the cash in a number of different banks. Some of these deposits were time deposits, usually for ninety days, but in some instances longer. Fifth received interest on its time deposits. Plaintiff calls this "investing." The court does not believe that merely putting one's money in the bank, even though one thereby obtains some interest, in and of itself is "investing, reinvesting or trading in securities" within the meaning of Section 3(a) (1). Surely a company which has suddenly come into possession of a substantial amount of cash is entitled to a reasonable time to decide what to do with it without violating the Investment Company Act.

Within a month or so Fifth began buying stocks with some of this money. It bought 31,461 shares of the Defiance stock at a cost of $340,568.94. It also bought a small block of American Steel, 923 shares, for $13,125. Fifth has continued to hold these.

In November and December 1966, it bought small amounts of stock in Wilson Brothers, Standard Packaging, Horn & Hardart Company and Republic Corporation. It disposed of all these in late 1966 or early 1967.

In December 1966 Fifth made its first tender offer for Austin, Nichols stock, as we have seen. At the end of December 1966, as has been recounted, Fifth spent $717,200 for Gateway stock which, within a few weeks, it turned over to Gray Line.

At December 31, 1966 Fifth owned considerable stock. It still had on hand, however, a substantial amount of cash. It had immediately available cash of $3,147,594 plus certificates of deposit of $616,000 plus foreign time deposits of $750,000, a total of $4,513,594.

The court believes that up to that time Fifth was still in a period of transition. It still had not fully committed its liquid resources. It had not yet made investing its primary business. Under the 3(a) (1) test, it was not then an investment company.

Defendants say that they were looking around for opportunities for Fifth to buy control of other companies. There is evidence to support that contention. In the fall of 1966 Muscat, Krock and Cohn considered several different proposals for the acquisition of companies by Fifth. All of them fell through for one reason or another.

Fifth announced publicly in December 1966 that it sought to buy 51 per cent of Austin, Nichols. As events turned out, Fifth never came close to achieving that objective. By December 31, 1966, Fifth had not acquired control of any company, except the 60 per cent interest in Gateway which it almost immediately passed over to Gray Line.

In 1967 Fifth continued to buy stock. It was particularly active in buying bank stocks. In January it spent $3,609,884.35 to acquire 33,401 shares of Mercantile, a 26 per cent interest in the company. In

February it bought 595 shares of University for $554,600 and lent its credit to American Steel to buy considerably more. It also purchased a comparatively small block of Guaranty, 2,087 shares, for $83,480.

The Austin, Nichols tenders were consummated in the winter and early spring of 1967. These took a sizable portion of Fifth's cash reserves. Fifth paid $2,312,582.54 for the 105,538 shares of Austin, Nichols common stock.

By June 30, 1967 Fifth owned substantially more securities and possessed substantially less cash than it had on December 31, 1966. As of June 30, its immediately available cash was $843,100 which, when added to time deposits of $775,000, made a total of $1,618,100 as compared to the $4,513,594 which it had had on December 31, 1966.

The time must eventually come when a corporation initially possessed of cash and no real business, by spending its cash becomes engaged in a business of some sort. That time had come by June 30, 1967.

What business was Fifth primarily engaged in on June 30? In the court's opinion, the only business that it can fairly be found to be primarily engaged in was the business of investing in securities. That was what it spent its money for. That is where its income came from. It had no other business which could reasonably be called "primary."

Westchester's buses and VIP's limousines were a negligible factor in Fifth's business. According to Fifth's own figures prepared by its new treasurer, Ellenbogen, the total income of Fifth and Surface on a consolidated basis for the first six months of 1967 was $266,158.60. Of this only $16,749.-72 came from Westchester. VIP produced a loss of $175,957.22.[14] And it cannot be said, merely because the securities owned by Fifth included stock constituting 26 per cent of Mercantile,

---

14. For the entire year 1967, according to Ellenbogen's figures, VIP lost $325,000.

Obviously Fifth would be better off as far as income is concerned without VIP.

that Fifth on June 30 was primarily engaged in the banking business.

Defendants argue that Fifth was not engaged primarily in the business of investing in securities on June 30, 1967 or at any other time because its policy was to buy stocks for the purpose of obtaining control of other companies. Although, as previously stated, the evidence indicates that at least at the outset this was Fifth's policy, Fifth has been markedly unsuccessful in carrying out that policy. The only company that it can be said to control is Mercantile.

■ But regardless of whether the policy was successful or not, the answer to defendants' argument, in the court's opinion, is that it finds no support in the language of the Act and indeed runs counter to the normal meaning of that language and to the fundamental purpose of the Act. The statute does not recognize an exception for the business that defendants claim Fifth is and was engaged in, i. e., the business of acquiring control of other companies.

■ Strangely enough, in an Act concerned entirely with the subject of investments, Section 2(a), which defines 42 different terms, does not define the word "invest." That word must be given its normal meaning, i. e., to put out money at risk in the hope of gain. It would not be reasonable to construe the word for the purposes of Section 3(a) (1) to include one kind of gain but not another. The Act should not be read to mean that buying a stock for dividends or for capital gain is investing but that buying it for control is not. Those who seek control obviously do so in the hope of ultimate gain. See Banker's Security Corp., 15 SEC 695 (1944), aff'd sub nom. Banker's Security Corp v. SEC, 146 F.2d 88 (3d Cir. 1944.)

■ Moreover, the legislative history shows that the purpose of the Investment Company Act was to prevent abuses which may grow out of the unregulated power of management to use large pools of cash. S.Rep. No. 1775, 76th Cong., 3d Sess. 6 (1940; Kerr, supra at 51–2.

Employing a company's cash to acquire control of other companies, thereby gaining access to their cash which, in turn, can be used to acquire still more companies, was one of the activities which the Act was intended to regulate. It would defeat the purpose which the Act was meant to accomplish if the court were to hold that such activities are outside the scope of the statute.

On all the evidence the court finds that on June 30, 1967 Fifth was an investment company within the meaning of Section 3(a) (1). There is no evidence to indicate that Fifth has changed its business since June 30, 1967. It follows that it is now an investment company.[15]

### Section 3(a) (3)

There are two elements to the test set up by this section. In the first place, the company must engage or propose to engage in the business of investing, reinvesting, owning, holding or trading in securities. In the second place, it must meet a mechanical standard, i. e., the value of its "investment securities" must exceed 40 per cent of the value of its total assets, as defined in the section.

Plaintiff claims, and defendants deny, that Fifth was an investment company under this test on December 31, 1966 and on June 30, 1967. Those specific dates have been selected for the valuation of Fifth's assets. For the reasons hereinafter set forth, the court finds that Fifth was not an investment company under the Section 3(a) (3) test on December 31, 1966 but that it was one on June 30, 1967.

### December 31, 1966

■ The short answer to plaintiff's contention is that on that date Fifth was not yet engaged in the business of investing or holding securities. It had bought some and it held some, it is true. But the court has already found under Section 3(a) (1) that this had not be-

---

15. The court considers it probable that this case is an instance of an investment company which, over a period of time, became one inadvertently, even under the Section 3(a) (1) test.

come Fifth's "primary" business. The court now finds that by that date buying and selling securities had not attained the stature of a business, primary or otherwise. "Business" implies continued activity. The court believes it unreasonable to construe the Act to mean that once a company which previously had no business begins to buy a comparatively few blocks of stock, it automatically becomes engaged in the business of investing in and holding securities. Under the circumstances present here, a company is entitled to a reasonable time within which to turn around, so to speak, to make up its mind what business it will henceforth engage in. Two and one-half months is not too much time to allow it for that purpose. On December 31, 1966, therefore, Fifth did not meet the first branch of the 3(a) (3) test.

The court, however, does not rest its determination of Fifth's status on December 31, 1966 solely on this ground. It finds that on that date Fifth did not meet the second branch of the Section 3(a) (3) test either.

█ Application of the 40 per cent test involves two factors: (1) the value of a company's total assets, as defined in the section, (2) the value of its "investment securities." In this case, each side called an expert to testify on this subject. As might be expected, they disagreed on both factors.

### Fifth's Total Assets on December 31, 1966

The problem as to assets involves the interpretation of the phrase "government securities and cash items" which the statute requires to be excluded from total assets for the purpose of this computation. This apparently simple language raises difficulties in the case which one would not normally expect to encounter. The court's conclusions on these matters will be briefly stated.

Plaintiff claims that Fifth's total assets for computation purposes on December 31, 1966 were $6,146,809. The court finds that they were $6,538,809. The difference arises in two ways: (1) plaintiff has included in assets amounts which the court finds should have been excluded as "cash items"; (2) plaintiff has excluded as cash items amounts which the court finds were not cash items and therefore should have been included.

The term is defined in Section 6–03.1 of Regulation S–X, a regulation which prescribes accounting rules for investment companies. It reads as follows:

"1. Cash and cash items.—State separately (a) cash on hand, demand deposits, and time deposits; (b) call loans; and (c) funds subject to withdrawal restrictions. Funds subject to withdrawal restrictions and deposits in closed banks shall not be included under this caption unless they will become available within 1 year."

█ It will be observed that while this rule deals with "time deposits," it does not mention the term "certificate of deposit." A certificate of deposit is merely a piece of paper evidencing the existence of a time deposit. The court sees no valid distinction, as far as Section 3(a) (3) is concerned, between a time deposit which is not evidenced by a certificate and one that is. Except in special circumstances, a time deposit is defined to be a cash item. When it is evidenced by a certificate, it should still be regarded as a cash item.

█ Plaintiff included in its computation of Fifth's assets certificates of deposit for ninety days or less aggregating $616,000 and a six-months' time deposit in Banco Suizo of $250,000. The total of these is $866,000. This sum should be considered cash items and thus excluded from the total assets.[16]

The other amount in question is "special and franchise deposits." Put as

16. On December 31, 1966 Fifth also had a time deposit of $500,000 in Geoffrey's Bank. This was not payable until March 1968. It was thus not "available within one year" and hence under Regulation S–X it was not a cash item. It was thus properly included in total assets on that ground.

simply as possible, these came about in the following fashion. In the past when Fifth operated buses, it was a self-insurer against tort and workmen's compensation claims. As such, it was required to keep securities on deposit with the Public Service Commission. These deposits have continued, for Fifth is still responsible for claims arising before March 1962.

On December 31, 1966 these deposits consisted in part of government bonds aggregating $1,258,000. Plaintiff excluded these from Fifth's total assets on the theory that they constituted "government securities" within the meaning of the statute.

It would seem that the purpose of this statutory exclusion is to remove liquid assets from the 40 per cent computation. But these deposits were not liquid. As a practical matter, they were frozen in the hands of the Public Service Commission. The court finds that they are not within the statutory exclusion and hence should be treated as assets.

The arithmetical result of the foregoing is as follows:

| | | |
|---|---|---|
| Total assets according to plaintiff | | $6,146,809 |
| Deduct: | | |
| Certificates of deposit | $616,000 | |
| Suizo deposit | 250,000 | 866,000 |
| | | $5,280,809 |
| Add: | | |
| Special deposits | | 1,258,000 |
| Total | | $6,538,809 |

This analysis accepts, for the sake of argument, plaintiff's contention that as of December 31, 1966, Fifth's claim against the city for intangibles should not be treated as an asset because it had not as yet been reduced to judgment. Of course, if a value is ascribed to it, the total of the assets would be higher than the above figure.

### Investment Securities on December 31, 1966

Plaintiff contends that the total value of Fifth's investment securities on December 31, 1966 was $4,259,017. The court finds it to be $1,286,887.

The relevant statutory definitions have previously been set forth. To recapitulate briefly: Section 3(a) (3) says that "investment securities" means all securities except "government securities" and securities "issued by majority-owned subsidiaries of the owner which are not investment companies." The long-winded definition of "security" in Section 2(a) (35) includes the phrase "evidence of indebtedness." Plaintiff says that an indebtedness may be "evidenced" orally. Thus, it treats this phrase as though it read "indebtedness," and consequently, regards every indebtedness which is not a government bond or the stock of a non-investment company subsidiary as an "investment security." This interpretation of the definitions leads in some instances to results which seem to the court to border upon the absurd.

Thus, plaintiff includes among Fifth's investment securities its claim against Krock for the return of the $175,000 duplicate payment which had not been returned by December 31, 1966. The court rejects this classification. The word "investment" in the section must have some significance. The court does not see how a claim for the return of a payment erroneously made can conceivably be called an investment.

Plaintiff also claims that the ninety day certificate of deposit totalling $616,-

000 and the Suizo time deposit of $250,-000 are investment securities. As previously found, these items are cash and hence should not be in the computation at all.

Plaintiff treats advances by Fifth to Gray Line totalling $1,285,513 as investment securities. These were advances on open account. They were not evidenced by a writing. One of the largest of them consisted of the money paid by Fifth to Morrill & Co. to repay the loan made by Krock and Muscat to Gray Line, including the $107,000 premium thereon, as previously related. In the court's opinion, to treat these advances as "evidences of indebtedness" and hence, because they are not government bonds, to say that they are "investment securities," is an unrealistic and incorrect construction of the statutory language.

Finally, plaintiff included in total assets so much of the special deposits held by the Public Service Commission as consisted of municipal bonds rather than government bonds. They totalled $645,-617. Since the court has found that the entire deposit should be considered an asset, it, of course, agrees with plaintiff's treatment of this part of the deposit, as far as assets are concerned.

But we are now considering plaintiff's classification of assets as investment securities. Plaintiff regarded these municipal bonds as investment securities. The court disagrees. Here again, the word "investment" must be given some significance. All these special deposits grew out of Fifth's former bus line operation. They are assets which, by virtue of that operation, Fifth was required to post with the Public Service Commission. The court does not think it reasonable to consider them as investments.

The arithmetical result of the foregoing is as follows:

| | | |
|---|---|---|
| Investment securities according to plaintiff | | $4,259,017 |
| Deduct: | | |
| Duplicate payment to Krock | $ 175,000 | |
| Certificates of deposit | 616,000 | |
| Suizo deposit | 250,000 | |
| Advances to Gray Line | 1,285,513 | |
| Special deposits | 645,617 | 2,972,130 |
| Total investment securities | | $1,286,887 |

The court has found that the assets of Fifth, for computation purposes, on December 31, 1966 totalled $6,538,809. Forty per cent of that figure is $2,615,523. It is obvious, therefore, that investment securities aggregating only $1,286,887 do not meet the 40 per cent test. They constitute only approximately 20 per cent of the total assets. Hence, Fifth was not an investment company on December 31, 1966 under the Section 3(a) (3) test.

*June 30, 1967*

Here there is no difficulty with the first branch of the Section 3(a) (3) test. The court has already found that as of June 30, 1967, investing in securities was Fifth's primary business. As to the 40 per cent formula constituting the second branch of the test, the court finds that this was met as well on June 30, 1967.

*Fifth's Total Assets on June 30, 1967*

Plaintiff claims that Fifth's assets for computation purposes on June 30, 1967 totalled $13,952,567. The court finds that they totalled $15,266,033.

Some of the questions are the same as those already discussed with respect

to the state of affairs on December 31, 1966. As to certificates of deposit, there was only one on June 30, 1967, a certificate for $25,000. This should have been deducted from assets as cash.

■ On June 30, 1967, the Suizo deposit was no longer a cash item under Regulation S–X because Suizo was then a closed bank. This item, therefore, was properly included in assets for computation purposes as of this date.

The special deposits with the Public Service Commission as of June 30 contained government securities and cash aggregating $1,338,466. For the reasons previously stated, the court finds that this sum should have been included in assets.

■ The most important question as of June 30, 1967, both as to assets and as to investment securities, is the proper treatment to be given to Fifth's claim against New York City for intangibles. By June 30, 1967, this claim had been reduced to judgment in the sum of $1,-257,500, according to the opinion of Mr. Justice Hecht at Special Term. Matter of City of New York (Fifth Avenue Coach Lines, Inc.), N.Y.L.J., April 18, 1967, pp. 18, 19.

Plaintiff treats this judgment as an asset, but for reasons which are not entirely clear, states that the amount of the judgment was $1,233,735. Since the discrepancy of some $24,000 in no way affects the result, the court, for simplicity's sake, will take plaintiff's figure as constituting the correct amount of the judgment, just as defendants' expert did.

Mr. Justice Hecht also awarded Surface $1,320,000 on its claim for intangibles. The award to Surface is not separately shown as such in the total of Fifth's assets because Section 3(a) (3) requires that the computation be made "on an unconsolidated basis." The award is taken into account, however, in the value attributed to Fifth's stock in Surface. The parties have stipulated that apart from the award, this stock had a value of minus $400,000.

At a meeting held on December 18, 1967, Fifth's board of directors deter-

mined that the fair value of Fifth's claim for intangibles was $13,490,000, and the fair value of Surface's claim was $16,520,000, a total of $30,010,000. The board acted on the advice of independent counsel recently retained by Fifth who represented Fifth on the trial of this action. The minutes of the meeting recite that, although Fifth does not consider itself to be an investment company, inasmuch as plaintiff, by instituting this action, has sought a contrary determination, the board now considers it appropriate to value these assets pursuant to Section 2(a) (39) of the Act, without prejudice, however, to its contention that the Act does not apply to Fifth.

Section 2(a) (39), previously quoted, provides in substance that securities having a market value shall be valued at that market value, but that "other securities and assets" shall be valued at fair value "as determined in good faith by the board of directors."

The figure of $30,010,000 is substantially the same figure as Fifth and Surface claimed before Mr. Justice Hecht and in the Appellate Division and which they now claim in the New York Court of Appeals. Mr. Justice Hecht's opinion characterized this claim as "grossly disproportionate to the allowances in the cases relied on in the majority opinion of the Court of Appeals." (p. 18)

The question is whether, for the purposes of a Section 3(a) (3) computation as of June 30, 1967, Fifth's claim (and Surface's claim also as reflected in the value of its stock) are to be taken into assets at the value thus placed upon them by Fifth's board of directors in December 1967 or at the value fixed by the Supreme Court, New York County, on April 18, 1967, and affirmed by the Appellate Division in January 1968. After careful consideration, the court concludes that the value fixed thus far by the New York courts must be accepted. It is true, of course, that the New York Court of Appeals may hold that the award was too low. It is also true, at least theoretically, that it may hold

that it was too high. Unfortunately, it is not practicable for this court to defer decision of this case until the New York courts have finally spoken. The present case must be decided now.

The court does not doubt the good faith of Fifth's present independent counsel in advising the board of what he believed to be its rights. Moreover, the court assumes, without deciding, that in setting the value at the figure for which Fifth has consistently contended, Fifth's directors were acting in good faith, even though Mr. Justice Hecht found a very much lower figure. But in the court's opinion, it was not open to Fifth's directors to value this asset under Section 2(a) (39) once the Supreme Court, New York County, had determined its value.

This claim was not an asset without market value within the meaning of the statute. The statute does not fit this situation. Under these unusual circumstances, the only figure that one can tie to is the figure set by the New York courts. Defendants concede that once the New York courts have finally determined the question, the value which they fix must be accepted, whether the board agrees or not. The decision of the Supreme Court, New York County, and the Appellate Division constitute the decisions of the New York courts on this subject at the moment. Until some other decision is handed down, they must be considered conclusive as to the value of the claims on June 30, 1967.

The arithmetical result of all this is as follows:

| | |
|---|---:|
| Total assets according to plaintiff | $13,952,567 |
| Deduct: | |
| Certificate of deposit | 25,000 |
| | $13,927,567 |
| Add: | |
| Special deposits | 1,338,466 |
| Total Assets | $15,266,033 |

---

### Investment Securities on June 30, 1967

Plaintiff contends that the total value of Fifth's investment securities on June 30, 1967 was $12,470,930. The court finds that it was $8,389,463.

■ Most of the items which account for the difference are similar in principle to the items already discussed with respect to December 31, 1966. Here again, plaintiff has advocated its theory that unliquidated claims on the part of Fifth against Krock and Muscat are investment securities held by Fifth and, presumably, issued by Krock and Muscat. Thus, the claim for Krock's commitment fee of $427,500, for various withdrawals by Krock said to total $193,719, and an item of $7,500 labeled "Due from Victor Muscat" are all included. To the court it seems manifest that these claims are neither securities nor investments. They should be deducted from the total.

The certificate of deposit for $25,000 was improperly included, being cash. And that portion of the special deposits held by the Public Service Commission which did not consist of government bonds or cash, i. e., a portion of the deposit totalling $655,627, was not an investment security on June 30, 1967 any more than the corresponding amount was on December 31, 1966. Open account advances to Gray Line also should have been omitted, for the reasons previously stated.

■ The only new item not previously discussed is Fifth's judgment on the award for intangibles stated to

amount to $1,233,735.[17] It is true that a judgment is an asset, and it can be said to be an "evidence of indebtedness." Obviously it is not a "government security" or a security of a majority-owned subsidiary. A literal combination of Section 2(a) (35) with Section 3(a) (3), therefore, produces the result for which plaintiff contends. But again, this literal result is an unreasonable one. As a matter of common sense, a company which sues for compensation for property taken from it by the right of eminent domain is not "investing" either in the suit or in the resulting judgment.

The arithmetic is as follows:

| Investment securities according to plaintiff | | $12,470,930 |
|---|---|---|
| Deduct: | | |
| Certificate of deposit | $ 25,000 | |
| Claim against Krock | 193,719 | |
| Claim against Krock | 427,500 | |
| Due from Muscat | 7,500 | |
| Advances to Gray Line | 1,538,386 | |
| Special deposits | 655,627 | |
| Judgment against New York City | 1,233,735 | 4,081,467 |
| Total investment securities | | $8,389,463 |

The court has found that the assets of Fifth, for computation purposes, on June 30, 1967, were $15,266,033. Investment securities of $8,389,463 is approximately 55 per cent of this total. Therefore, on June 30, 1967, Fifth met the 40 per cent test and was an investment company under Section 3(a) (3).

*Section 17(a) of the 1933 Act,*
*Section 10(b) of the 1934 Act*
*and Rule 10b-5*

Although these sections are well known, it will nevertheless facilitate the discussion to quote them in full. Section 17(a) of the 1933 Act provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Section 10(b) of the 1934 Act provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national se-

17. Plaintiff concedes that Surface's award, as distinct from Fifth's, is not an investment security because it is reflected in the value of Surface's stock, and that stock being the stock of a wholly-owned subsidiary of Fifth, is specifically excluded by Section 3(a) (3) from investment securities.

curities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b-5 defines "manipulative and deceptive device" for purposes of the 1934 Act as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

The 1933 Act covers fraud in the sale of securities. The 1934 Act applies to both purchases and sales.

The definition of security in Section 2(1) of the 1933 Act reads as follows:

"When used in this title, unless the context otherwise requires—

(1) the term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

The definition of security in the 1934 Act, contained in Section 3(10) is in substance the same as that in the 1933 Act except in two respects: (1) it does not contain the phrase "evidence of indebtedness," and (2) it specifically excludes a note "which has a maturity at the time of issuance of not exceeding nine months."

Plaintiff claims that many of the specific transactions which have heretofore been described violated both Acts. In each instance the transaction is said to involve a fraud in the purchase and sale of securities. In each instance the person said to be defrauded is Fifth.[18]

■ By and large, the court believes that to apply the fraud sections of the 1933 and 1934 Acts to most of these transactions would stretch those statutes beyond the breaking point. The court is mindful of the platitude about the kind of law that hard cases make. This is a hard case in the sense that many of these transactions constitute flagrant violations of fiduciary duty. But that is not justification for straining to bring them within the prohibition of statutes which, sensibly construed, do not apply to them.

Boiled down to their essentials, the transactions with which we are concerned amounted to:

(1) An excessive charge for a loan made by Krock to Fifth in 1965.

(2) An excessive charge for a loan made by Krock and Muscat to Gray Line

18. No claim of violation of the 1933 or 1934 Acts is made with respect to the following: (a) the deposits in Geoffrey's Bank and in Banco Suizo; (b) Krock's withdrawals of cash in 1967 for alleged office expenses, travel expenses, legal fees and consultant's fees.

in 1966 and paid by Fifth, plus a silly mistake by Fifth in paying $175,000 too much in paying off the loan. This extra $175,000 has been returned to Fifth.

(3) Use of Fifth's money in 1966 to enable Cohn, via Saxe, Bacon & Bolan, to pay his obligations to Krock and Muscat.

(4) Diversions by Krock in 1967 of Fifth's money by putting $135,000 in Defiance's account and by transferring $152,500 to TelePro. Of the sums thus diverted, all but $52,500 has been returned.

(5) An excessive charge by Krock in 1967 for a commitment fee on a commitment which he was never called upon to perform.

(6) A sale of Gateway stock by Fifth to Gray Line in 1967.

(7) A lending of its credit by Fifth to American Steel in 1967 in connection with American Steel's purchase of University stock.

With the exception of item no. 6, it is the court's opinion that none of these transactions constitute fraud in connection with the purchase or sale of securities within the meaning of Section 17(a) of the 1933 Act or Section 10(b) of the 1934 Act and Rule 10b–5 thereunder. Each transaction will be briefly considered.

### The Krock Loan to Fifth in 1965

■ What Krock did was to deposit $885,944.45 in Fifth's account in Worcester in October 1965. In May 1966 he helped himself to the entire proceeds of Fifth's certificate of deposit, amounting to $1,030,150 plus $20,131.95 more of Fifth's money consisting of interest on an entirely separate certificate of deposit. This transaction does not involve any "security." There was not even a note from Fifth to Krock for the $885,-944.45. The dealings between Krock and Fifth were oral, except for the reference to this loan in the minutes of September 26, 1965. This is purely an individual loan transaction. Although it involved a violation of Krock's fiduciary duty to Fifth, the court concludes that the 1933

and 1934 Acts were not intended to deal with such a situation.

### The Loan by Krock and Muscat to Gray Line

■ This transaction is essentially similar to the first. In this instance, it is true, there was a note from Gray Line to Morrill. But Krock and Muscat did not "sell" this note to Fifth, nor did Fifth "purchase" it, in any normal sense of those words. The loan went to Gray Line because it was Gray Line which was indebted to Hertz. Gray Line did not have any money. Fifth eventually did. Hence, Krock and Muscat caused Fifth to pay Gray Line's loan, plus a premium of $107,000 in the bargain. This is overreaching on an individual loan transaction, but it is not fraud in the purchase or sale of securities within the meaning of the two Acts.

The $175,000 duplicate payment was merely a bookkeeping error.

### Fifth's Loans to Saxe, Bacon & Bolan

Fifth's note to Saxe, Bacon & Bolan for $85,000 was for ninety days. Thus, it was specifically excluded from the definition of a security in the 1934 Act. Saxe, Bacon & Bolan's note to Fifth for $300,000 was also for ninety days, although its second note for $225,000 (reducing the original note by $75,000 after rendition of Saxe, Bacon & Bolan's bill in that amount) was for one year.

But the court does not rest its conclusion upon this narrow ground. Regardless of the term of the notes, they do not constitute securities within the fair meaning of the Acts. The "personal loan" cases relied upon by plaintiff are for the most part distinguishable. They involve either investment contracts or a whole series of notes, not one or two. The transactions here are individual loans. One does not normally speak of the "purchase" or "sale" of a loan, whether or not it is evidenced by a note. See Beury v. Beury, 127 F.Supp. 786 (S.D. W.Va.1954), appeal dismissed, 222 F.2d 464 (4th Cir. 1955); 1 Loss, Securities Regulation 546 (2d ed. 1961).

The court is not called upon to decide whether Fifth received adequate consideration for the $300,000 loan. Saxe, Bacon & Bolan were of course entitled to fees for the work which they did as attorneys for Fifth. The evidence does not permit a determination as to whether the amounts of these fees charged as offsets to the note were or were not excessive. Even if they were not, it is strange behavior for a law firm to obtain payment from a client before rendering any bill for services and even before some of the fees have been earned. It is clear that the real purpose of obtaining such a substantial payment of fees in advance was to enable Cohn to pay off his personal debts. However much this may involve overreaching and a misuse of Fifth's funds, it does not in the court's opinion constitute fraud in the purchase or sale of securities.

### The $135,000 Mistake and the Transfer to TelePro

These are purely and simply unauthorized payments out of Fifth's bank account for purposes having nothing to do with Fifth. They involve no securities. Krock sold nothing to Fifth and Fifth bought nothing from him. To all intents and purposes they are in the same category as Krock's withdrawals from Fifth's account in 1967. The court sees no basis for holding that Section 17(a) and Section 10(b) cover such transactions.

### Krock's Commitment Fee

Here in substance, Krock agreed to make a loan to Fifth which he never made. To call this agreement the "sale" of a security is unrealistic. Perhaps Krock is fairly entitled to retain some part of the $427,500 as compensation for entering into this undertaking and putting himself in a position to perform it if called upon. Whether he is or not is a question which is not now before the court. Section 17(a) and Section 10(b) are not involved, in any event.

### Sale of Gateway Stock

Here at last we have a security, i. e., the stock of Gateway. Fifth sold this to Gray Line. Gray Line agreed to pay for it but thus far it has not paid. Was there a fraud practiced upon Fifth in connection with this sale?

Saxe, Bacon & Bolan handled this transaction. Ruffa was on both sides of it. He acted for Fifth in buying the stock from Howell and for Gray Line in buying it from Fifth. Krock signed the latter contract for Fifth. The reason for the transaction seems to have been an initial mistake on the part of Saxe, Bacon & Bohlan in not appreciating that Fifth would run afoul of the Bank Holding Company Act if it owned both Gateway and Mercantile stock. But for this statute, presumably Fifth would have continued to hold the Gateway stock and there never would have been any transaction with Gray Line.

Gray Line was used as a receptacle for the stock. From one point of view it could be said that this was not a sale at all, but merely a transfer of this security from one pocket to another, so to speak. In fact, however, as well as in form, there was a sale, a transfer of title to the stock from Fifth to Gray Line. And it was a sale which was not in Fifth's best interest because Gray Line was merely a shell. Unless Gray Line were to sell its holdings of Fifth's stock, a most unlikely possibility under the circumstances, Gray Line obviously was in no position to pay for the Gateway stock.

As far as appears, this transaction was not submitted to Fifth's board for approval. There was thus a failure to advise Fifth through its board of directors of material facts which had a bearing on whether or not this transaction should be approved.[19]

---

19. Plaintiff claims that the board of directors were "dummies." This seems to the court to be hard on men like Silbert, Murphy and Brunner, who had no personal axe to grind in these transactions.

It would seem to be true, however, of Krock's appointees, Moore and Wolfson. There is no need to decide the question, for in this instance, the board was not given an opportunity to act.

■ This transaction has not as yet caused damage to Fifth. Now that the contract has been amended so as to provide for the pledge by Gray Line to Fifth of the Gateway stock as security for the payment by Gray Line of the purchase price, it is to be hoped that loss can be avoided. But whether or not there is damage is not the question. It does not unduly extend the 1933 and 1934 Acts to hold that in this instance the failure to disclose the facts to Fifth's board of directors constituted fraud in the sale of securities within the meaning of those statutes. See A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967); Schoenbaum v. Firstbrook, Docket No. 31408 (2d Cir. May 29, 1968).

■ The court finds that Muscat, Krock and Cohn participated in this transaction. The evidence as to Bolan is not clear enough to justify a similar finding as to him.

### The Loan to American Steel

There are two questions here: (1) was there any fraud; (2) if so, was it in connection with the purchase or sale of a security?

The stock of University is of course a security. American Steel bought 1,880½ shares of it and Fifth itself bought 595 shares. But no fraud in connection with that purchase is asserted. The purchase of the 595 shares by Fifth was authorized by Fifth's board of directors on February 8, 1967.[20]

What plaintiff complains of is the fact that Fifth lent $1,800,000 to American Steel to enable it to make the purchase. Fifth simultaneously borrowed that sum from Security. Both loans were evidenced by notes.

Here again, the transaction under attack is a single loan. It differs from Krock's and Muscat's loans to Fifth previously discussed in that the purpose of this loan had to do with the purchase of stock. But Fifth was not selling the stock to American Steel or buying the stock from it. It seems far-fetched to treat any misrepresentations or omissions as being in connection with the purchase or sale of stock.[21]

Moreover, it is hard for the court to see any fraud in this transaction, in the Securities' Act sense. Fifth received more interest from American Steel than it paid to Security. The evidence is not convincing that American Steel, which is an operating company in actual business and solvent, as far as appears, will be unable to pay this loan. It has paid it so far.

The evidence is unsatisfactory as to whether Fifth's board of directors authorized this loan. Bolan, as secretary of Fifth, certified to Security purported copies of a resolution approving it. No such minute appears in Fifth's minute book. It is said to have been mislaid. This is not impossible. The evidence shows that Fifth's minute keeping, usually performed by employees of Saxe, Bacon & Bolan, was as haphazard as its bookkeeping.

■ All in all, the court concludes that plaintiff has not proved a violation of Sections 17(a) and 10(b) with respect to this transaction.

### Conclusions

No money judgment is sought in this case. What is asked is an injunction and the appointment of a receiver. The court's conclusions on these matters are as follows.

### Investment Company Act

■ Fifth is an investment company and has been one since June 30, 1967.[22]

---

20. The resolution speaks of 590 shares which was the amount originally contemplated. The discrepancy of five shares is not material.

21. The fact that American Steel's note to Fifth was concededly an "investment security" for purposes of the 40 per cent computation under the Investment Company Act does not affect this conclusion.

22. Fifth was not an investment company on December 31, 1966. The evidence does not permit a finding as to whether it became one at some point between December 31, 1966 and June 30, 1967.

Section 7(a) of the Act provides in substance that no investment company, unless it is registered, shall use the means and instrumentalities of interstate commerce to buy or sell securities, or to offer to buy or sell them, or to engage in interstate commerce, either directly or through a controlled company. Fifth has violated this section. It should have registered with the Commission, at least by June 30, 1967, and it failed to do so. Since then, it has engaged in interstate commerce, both directly and through its controlled company, Mercantile. Before this action was begun on October 27, 1967, it attempted to purchase more Austin, Nichols stock from Axe-Houghton. Plaintiff is thus entitled to an injunction requiring Fifth to register and enjoining it from engaging in business until it does.

Plaintiff's action is based upon Section 42(e) of the Act, which provides that upon a showing that a person "has engaged or is about to engage" in a violation of the Act, the court shall grant an injunction. The specific acts alleged to have violated Sections 17(a), 17(d), 21 (b), 36 and 37 of the Act all occurred before June 30, 1967. They could not and did not violate the Act because Fifth was not then an investment company. The question, therefore, as far as injunctive relief against the individual defendants is concerned, is whether plaintiff has shown that defendants are "about to engage" in violations.

There is no doubt that if acts similar to those previously committed are repeated hereafter, they will violate the Act. They constitute just the sort of self-dealing and dealing with affiliated companies which the Act was designed to prevent. Certain of the defendants have evidenced a marked propensity for such conduct. In a sense, it is just their good fortune that they have not already violated the Act. They took a chance on the proposition that Fifth was not an investment company. If the court had found it to be one on December 31, 1966, they would have found themselves to have violated the Act by the transactions subsequent to that date.

As far as the record shows, Muscat and Cohn are still in control of Fifth through Defiance and BSF.[23] Although Krock appears to be out at the moment, there is no assurance that he will not patch up his apparent quarrel with Muscat and Cohn and rejoin the triumverate.

The court believes that there is a real danger that unless an injunction is issued, the sort of activities which have taken place heretofore will be repeated. There is a substantial probability of irreparable injury to Fifth and its stockholders in this respect. The court concludes that there is a sufficient likelihood that certain defendants are "about to engage" in prohibited activity to warrant an injunction. The public interest is paramount. The court concludes that there is a proper basis for the exercise of its discretionary power to grant injunctive relief restraining violations of the Act. See Securities and Exchange Commission v. Culpepper, 270 F.2d 241 (2d Cir. 1959)

Against whom should the injunction be directed? Krock, of all the defendants, profited most from these transactions in the sense that he got the most cash out of them for himself. Muscat participated in the premium on the loan to Gray Line. More important in his case is the indirect benefit that he obtained for other companies in his complex, Gray Line and American Steel. Cohn benefited from the use of Fifth's money to pay the loans made to him by Muscat and Krock which

---

The evidence was focused on those two dates. It is thus not practicable to say how long before June 30, 1967 Fifth acquired that status.

23. Since this case was tried, there have been newspaper reports that Cohn has sold most of his Defiance stock. Only yesterday, copies of correspondence were sent to the court indicating that Fifth is considering selling its Defiance stock. Obviously, the court must base its decision on the record of the trial, not on newspaper reports or subsequent correspondence.

enabled him to acquire his Defiance and BSF stock. Bolan, as far as appears, did not personally benefit from any of these transactions.

Plaintiff claims that all defendants have acted in concert, that they have conspired to use Fifth for their own purposes. The court finds that this claim has been substantiated as to Muscat, Krock and Cohn.[24] As to Bolan, the court finds that the claim has not been proven. An injunction will therefore be issued as against Muscat, Krock and Cohn but not against Bolan.

### The 1933 and 1934 Acts

The Gateway transaction is sufficient basis to warrant an injunction against Muscat, Krock and Cohn against further violations of Section 17(a) and Section 10(b). As the court has already pointed out, the evidence does not justify a finding that Bolan personally participated in this transaction. The injunction therefore will not run against him.

### The Request for a Receiver

 Section 42(e) of the Act provides that in a proceeding to enforce compliance with Section 7, which this is, the court may, "to the extent it deems necessary or appropriate, take exclusive jurisdiction and possession of the investment company * * * involved * * * and the court shall have jurisdiction to appoint a trustee * * *." Plaintiff vigorously presses for this relief. Fifth, with equal vigor, opposes it as unnecessary and expensive.

There is no doubt that the best interest of Fifth and its stockholders requires a strong independent management to lead the company out of its difficulties, to clean up the past and to prepare for the future. The day is not far off when Fifth, in all likelihood, will acquire sub-stantial additional funds on the award for intangibles. As far as one can see at the moment, there is no need for liquidation of Fifth. The need is for constructive management.

The court has given prolonged consideration to this problem. It wishes to avoid doing anything which might be thought unjust to Bolan who, since he became president of Fifth in May 1967, appears to have accomplished some improvement in administering Fifth's affairs, at least as compared with the way they were handled under Muscat. Of course, the court has no desire to burden Fifth and its stockholders with unnecessary expense.

Bolan is the senior partner of Saxe, Bacon & Bolan. He is so closely associated with Cohn that he allows Cohn to sign his name to important documents. Saxe, Bacon & Bolan and Cohn have been and are closely connected with Fifth, much more intimately than in the normal attorney-client relationship. Bolan has been an officer of Fifth ever since January 1965. He has worked with Krock and Muscat over the years on the affairs of Fifth and the other companies. Muscat and Cohn still control Fifth.

The court feels that in fairness to Fifth's stockholders, it simply cannot take a chance on Bolan. It is the court's best judgment that the situation demands the appointment of a wholly disinterested officer of the court to administer Fifth, to prosecute its action against Krock, to investigate and ascertain whether there are other actions that can be maintained.

There is no need to duplicate expense. The court has conferred with Judge Palmieri who authorizes the court to state that upon appointment of a receiver, he will vacate his order in the *Braasch* case appointing the Special Fiscal Agent.

---

24. In this connection, the court attaches importance to the fact that Cohn was instrumental in persuading Fifth's board of directors, at its meeting on June 28, 1967, to ratify many of these transactions, including the premium to Krock and Muscat on the Gray Line loan, and Krock's "mistakes" in transferring Fifth's money to Defiance and TelePro.

Although Cohn may not have known of these matters at the time they occurred, his action at the June 28 meeting impresses the court as an attempt on his part to "cover up" for Muscat and Krock. This indicates concert of action among them. Bolan was not present at the June 28 meeting.

A receiver will be appointed for the time being, at least until after an annual meeting of stockholders. The court will retain jurisdiction to entertain an application by Fifth to terminate the receivership upon a showing that it is no longer necessary.

Pending the qualification of a receiver, the court will continue to control the disbursement of the Austin, Nichols proceeds. The stipulation requiring notice to the Commission of significant proposed transactions will continue in effect in the meantime.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Settle order and judgment on notice.